**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**
_____

No. 97-60421
_____


TEXAS OFFICE OF PUBLIC UTILITY COUNSEL; CELPAGE, INC.;
SOUTHWESTERN BELL TELEPHONE COMPANY; GTE MIDWEST, INC.;
LOUISIANA PUBLIC SERVICE COMMISSION, an Executive Branch
Department of the State of Louisiana; COMSAT CORPORATION;
PEOPLE OF THE STATE OF CALIFORNIA;
PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA;
IOWA UTILITIES BOARD; SOUTH DAKOTA PUBLIC UTILITIES COMMISSION;
PENNSYLVANIA PUBLIC UTILITY COMMISSION;
BELL ATLANTIC TELEPHONE COMPANIES;
VERMONT DEPARTMENT OF PUBLIC SERVICE; GTE SERVICE CORPORATION;
GTE ALASKA INCORPORATED; GTE ARKANSAS INCORPORATED;
GTE CALIFORNIA INCORPORATED; GTE FLORIDA INCORPORATED;
GTE SOUTH INCORPORATED; GTE SOUTHWEST INCORPORATED;
GTE NORTH INCORPORATED; GTE NORTHWEST INCORPORATED;
GTE HAWAIIAN TELEPHONE COMPANY INCORPORATED;
GTE WEST COAST INCORPORATED; CONTEL OF CALIFORNIA, INC.;
CONTEL OF MINNESOTA, INC.; CONTEL OF THE SOUTH, INC.;
PUBLIC SERVICE COMMISSION OF NEVADA;
CINCINNATI BELL TELEPHONE COMPANY;
FLORIDA PUBLIC SERVICE COMMISSION;
PEOPLE OF THE STATE OF NEW YORK;
PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK;
and
THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS,

                                        Petitioners,

                VERSUS

        FEDERAL COMMUNICATIONS COMMISSION
                and
        UNITED STATES OF AMERICA,

                                        Respondents.


_____

Petitions for Review of a Final Order
of the Federal Communications Commission
_____
July 30, 1999

Before SMITH, DUHÉ, and EMILIO M. GARZA, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

This is a consolidated challenge to the most recent attempt of the Federal Communications Commission ("FCC") to implement provisions of the landmark 1996 Telecommunications Act (the "Act").[1] Petitioners, joined by numerous intervenors, challenge several aspects of the FCC's Universal Service Order (the "Order") implementing the provisions of the Act codified at 47 U.S.C. § 254. We grant the petition for review in part, deny it in part, affirm in part, reverse in part, and remand in part.

I. BACKGROUND.

A. THE 1996 ACT AND THE UNIVERSAL SERVICE ORDER.

Beginning with the passage of the Communications Act of 1934 (the "1934 Act"), Congress has made universal service a basic goal of telecommunications regulation. As Section 1 of the 1934 Act stated, the FCC was created

> [f]or the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid,

_____

[1] Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (to be codified as amended in scattered sections of title 47, United States Code).

efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges . . . .

47 U.S.C. § 151 (as amended).

Armed with this statutory mandate, the FCC historically has focused on increasing the availability of reasonably priced, basic telephone service via the landline telecommunications network.[2] Rather than relying on market forces alone, the agency has used a combination of implicit and explicit subsidies to achieve its goal of greater telephone subscribership. Explicit subsidies provide carriers or individuals with specific grants that can be used to pay for or reduce the charges for telephone service. This form of subsidy includes using revenues from line charges on end-users to subsidize high-cost service directly and to support the Lifeline Assistance program for low-income subscribers.

Implicit subsidies are more complicated and involve the manipulation of rates for some customers to subsidize more afford-able rates for others. For example, the regulators may require the carrier to charge "above-cost" rates to low-cost, profitable urban customers to offer the "below-cost" rates to expensive, unprofitable rural customers.

---

[2] In economic terms, universal service programs are justified as a way to address a "market failure." While the carriers have little incentive to expand the telecommunications infrastructure into areas of low population density or geographic isolation, each individual user of the network benefits from the greatest possible number of users. *See* Eli M. Noam, *Will Universal Service and Common Carriage Survive the Telecommunications Act of 1996?*, 97 COLUM. L. REV. 955, 958-59 (1997).

3

For obvious reasons, this system of implicit subsidies can work well only under regulated conditions. In a competitive environment, a carrier that tries to subsidize below-cost rates to rural customers with above-cost rates to urban customers is vulnerable to a competitor that offers at-cost rates to urban customers. Because opening local telephone markets to competition is a principal objective of the Act, Congress recognized that the universal service system of implicit subsidies would have to be re-examined.

To attain the goal of local competition while preserving universal service, Congress directed the FCC to replace the patchwork of explicit and implicit subsidies with "specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service." 47 U.S.C. § 254(b)(5). Congress also specified new universal service support for schools, libraries, and rural health care providers. *See* 47 U.S.C. § 254(h). It then directed the FCC to define such a system and to establish a timetable for implementation within fifteen months of the passage of the Act.

The Federal-State Joint Board (the "Joint Board"), created by the Act to coordinate federal and state regulatory interests, issued two recommendations on how to implement the universal service provisions.[3] The FCC met the statutory deadline when it

---

[3] The first Recommended Decision was issued on November 8, 1996
(continued...)

4

issued the Order on May 8, 1997.[4]  Since that time, the agency has issued seven reconsideration orders (the last one on May 28, 1999) and has made two reports to Congress regarding the Order.

The FCC designated a set of core services eligible for universal service support, proposed a mechanism for supporting those services, and established a timetable for implementation. *See* Order ¶¶ 21-42.  Pursuant to the Act, the agency developed rules for modifying the existing system of support for high-cost service areas and created new support programs for schools, libraries, and health care facilities.

## 1.  HIGH-COST SUPPORT.

The FCC's plans for changing the high-cost support system required it to resolve a number of complicated issues, including (1) what methodology to use for calculating high-cost support; (2) how to allocate costs between the states and the federal

---

(...continued)
(12 FCC Rcd 87 (1996)), the second Recommended Decision on November 25, 1998 (13 FCC Rcd 24744 (1998)).

[4] Congress also directed that the FCC establish rules to achieve the local competition goals of the Act within six months of the Act's enactment.  The agency met this deadline when it issued the Local Competition Order on August 8, 1996.  Almost all parts of this order were affirmed by the Supreme Court.  *See AT&T v. Iowa Utils. Bd.*, 119 S. Ct. 721 (1999).

On the same day it issued the Order, the FCC released the Access Charge Order.  Access charges are the charges assessed between local exchange companies (LEC's) and interexchange companies (IXC's) for the use of one network by callers from the other network.  Challenges to this order were also consolidated before the Eighth Circuit. *See Southwestern Bell Tel. Co. v. FCC*, 153 F.3d 523 (8th Cir. 1998).

government; (3) which carriers should be required to contribute to the support system; and (4) when to implement the high-cost support program. The agency resolved the question of how to calculate the proper amount of high-cost support by accepting the Joint Board's second recommendation to identify areas where the forward-looking cost of service exceeds a cost-based benchmark and to provide extra support to any state that cannot maintain reasonable comparability.[5] *See Second Recommended Decision* ¶ 19; *Seventh Report and Order* ¶ 61 n.157.

Most importantly, the FCC decided to use the "forward-looking" costs to calculate the relevant costs of a carrier serving a given geographical area. In other words, to encourage carriers to act efficiently, the agency would base its calculation on the costs an efficient carrier would incur (rather than the costs the incumbent carriers historically have incurred).[6]

---

[5] This methodology is a departure from the revenue-based national benchmark proposed in the Order. The revenue-based benchmark was challenged for including discretionary revenues in its calculation and for its nationwide scope. Because of the revisions proposed by the Joint Board's Second Recommended Decision, we now consider those challenges to the prior revenue-based methodology moot. *See infra* part III.A.1.b.

[6] The agency made a decision to provide only 25% of the funds for high-cost support, leaving the state commissions ("the states") to provide the rest of the funds. According to the FCC, the states traditionally have provided a majority of universal service support, and if the agency were to fund all the high-cost support, it would overcompensate carriers. Moreover, the FCC claims that the 25% figure approximates the costs that historically have been assigned to the interstate jurisdiction. *See* Order ¶ 201.

The Joint Board, however, recommended that the FCC scrap the 25%/75% division of responsibility in favor of a more flexible plan of allocation. *See Second Recommended Decision* ¶¶ 4-5, 41-46. The FCC accepted the Joint Board's recommendation and eliminated the 25/75 rule on May 27, 1999, thereby mooting the
(continued...)

The FCC developed rules for determining which carriers should be required to contribute to the interstate universal service support system and how their contributions should be calculated. It decided to require all telecommunications carriers and certain non-telecommunications carriers to contribute in proportion to their share of end-user telecommunications revenues. *See* Order ¶¶ 39-42. The agency determined that to reduce the burden on individual carriers' prices, the carriers' contribution base should be as broad as possible. *See* Order ¶ 783. Therefore, the agency required contributing carriers to include their international tele-communications revenues in their contribution base and rejected claims by certain carriers,[7] which do not receive direct subsidies from the support program, seeking an exemption from making any contributions. *See* Order ¶ 805.

Finally, the FCC adopted a timetable for implementing its high-cost support plan. Because it has not yet developed an accurate assessment of forward-looking costs, it delayed implementation of its support program for non-rural carriers until January 1,

---

(...continued)
issue for this court. *See infra* part III.A.1.c. *See also Seventh Report and Order* ¶ 3 ("We explicitly reconsider and repudiate any suggestion in the *First Report and Order* that federal support should be limited to 25 percent of the difference between the benchmark and forward-looking cost estimates . . . .").

[7] These carriers include wireless service providers of paging and commercial mobile radio service ("CMRS"). The FCC also rejected a claim by CMRS providers seeking an exemption from making contributions to state support funds.

2000.[8] Additionally, because the agency believes it will take even longer to develop accurate forward-looking cost models for rural carriers, it delayed the implementation of its new support plan for rural carriers to "no sooner than January 1, 2001." *See* Order ¶ 204.

During this delay in implementation, the FCC decided that carriers will continue to receive support at the levels generated by existing universal support programs. According to the agency, this gradual, phased-in plan for implementing its new high-cost support system meets the Act's requirement of a "specific timetable for completion." *See* 47 U.S.C. § 254(a)(2).

2. SCHOOLS AND LIBRARIES.

Pursuant to § 254(h), the FCC adopted rules implementing new programs for schools, libraries, and health care facilities, in particular by providing universal service support for internet access and internal connections in schools and libraries. *See* Order ¶ 436. The agency decided that any entity, including non-telecommunications carriers, that provides internet access or internal connections to schools and libraries will receive universal service support. *See* Order ¶ 594.

To fund the new § 254(h) programs, the FCC accepted the Joint

---

[8] In the original order, the FCC had planned implementation by January 1, 1999. This date was delayed until July 1, 1999, and again to January 1, 2000. *See Seventh Report and Order* ¶ 5.

Board's recommendation to assess the interstate *and* intrastate revenues of providers of interstate telecommunications service. *See* Order ¶ 808. Because many states do not already have similar support programs for schools and libraries, the agency justified its inclusion of intrastate revenues as necessary to ensure adequate funding for § 254(h) programs.

### B.  CHALLENGES TO THE ORDER.

On September 5, 1997, petitioner Celpage Inc. filed a motion in this court to stay the Order. We denied that motion on October 16, 1997, and rejected a similar motion by various rural telephone companies on December 31, 1997. Their petitions, along with challenges to the Order by other petitioners, were consolidated in this court.

There are two sets of challenges to the Order. The first regards the FCC's plan for replacing the current mixture of explicit and implicit subsidies with an explicit universal service support system for high-cost areas. On both statutory and con-stitutional grounds, petitioners attack (1) the methodology for calculating support under the plan; (2) the allocation of funding responsibilities between the FCC and the states; and (3) the agency's restrictions on how carriers can recover universal service costs.

Other petitioners attack the FCC's high-cost support plan as

9

an encroachment on state authority over intrastate telecommunications regulation because it restricts state eligibility requirements and imposes a "no disconnect" rule for low-income telephone subscribers. Petitioners also challenge, for lack of specificity and for failing to delay implementation of the plan for some rural carriers, the FCC's timetable for implementing the new universal service plan. Additionally, petitioners challenge the FCC's system for assessing contributions, arguing that it improperly includes CMRS providers and unfairly assesses carriers on the basis of their international and interstate revenues.

The second set of challenges regards the FCC's proposal for implementing § 254(h) programs supporting schools, libraries, and health care providers. Petitioners claim that the FCC impermissibly expanded the scope of § 254(h) support to include the provision of internet access and internal connections. Moreover, they attack the FCC's statutory authority to provide such support to non-telecommunications providers.

Additionally, petitioners charge that the agency encroached on state authority to implement state support programs for schools and libraries and failed to designate which telecommunications services will receive § 254(h) support. They also argue that the FCC exceeded its statutory authority by requiring subsidies for toll-free telephone calls to internet service providers by non-rural health care providers. Finally, they attack the FCC's § 254(h)

contribution system because it assesses both the intrastate and interstate revenues of carriers.[9]

We affirm most of the FCC's decisions regarding its implementation of the high-cost support system, concluding, for the most part, that the Order violates neither the statutory requirements nor the Constitution. We remand for further consideration, however, as to the FCC's decision to assess contributions from carriers based on both international and interstate revenues. We also reverse (1) the requirement that ILEC's recover their contributions from access charges and (2) the blanket prohibition on additional state eligibility requirements for carriers receiving high-cost support.

On jurisdictional grounds, we reverse the rule prohibiting local telephone service providers from disconnecting low-income subscribers. We also conclude that the agency exceeded its jurisdictional authority when it assessed contributions for § 254(h) "schools and libraries" programs based on the combined intrastate and interstate revenues of interstate telecommunications providers

---

[9] The FCC also determined that it could require carriers to contribute, based on both interstate and intrastate revenues, to high-cost support as well as § 254(h) support. But for policy reasons, it decided to assess contributions on both interstate and intrastate revenues for support of § 254(h) programs only. It maintains, however, that it may impose similar assessments for high-cost support as well. *See Seventh Report and Order* ¶¶ 87-90.

We review the states' challenge to the FCC's claim of jurisdictional authority over intrastate rates in the context of its actions regarding support of the § 254(h) programs, but we also discuss its implications for FCC jurisdictional authority for support of high-cost programs. *See infra*, part III.B.5.

and when it asserted its jurisdictional authority to do the same on behalf of high-cost support.

## II.  STANDARD OF REVIEW.

When deciding whether the FCC has the statutory authority to adopt the rules included in the Order, we review the agency's interpretation under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984), by first deciding whether "Congress has directly spoken to the precise question at issue," *id.* at 842.  If so, we "give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43.  In this situation, we reverse an agency's interpretation if it does not conform to the plain meaning of the statute.  This level of review is often called "*Chevron* step-one" review.

Where the statute is silent or ambiguous, however, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.  We may reverse the agency's construction of an ambiguous or silent provision only if we find it "arbitrary, capricious or manifestly contrary to the statute." *Id.* at 844.  That is to say, we will sustain an agency interpretation of an ambiguous statute if the interpretation "is based on a permissible construction of the statute." *Id.* at 843.  We refer to this more deferential level of review as "*Chevron* step-two" review.

12

The Administrative Procedure Act ("APA") also authorizes us to reverse an agency's action if it acted arbitrarily or capriciously in adopting its interpretation by failing to give a reasonable explanation for how it reached its decision. *See* 5 U.S.C. § 706 (2)(A) (1994); *see also Harris v. United States*, 19 F.3d 1090 (5th Cir. 1994). "Arbitrary and capricious" review under the APA differs from *Chevron* step-two review, because it focuses on the reasonability of the agency's decision-making processes rather than on the reasonability of its interpretation. [10]

Finally, we do not give the FCC's actions the usual deference when reviewing a potential violation of a constitutional right. "The intent of Congress in 5 U.S.C. § 706(2)(B) was that courts should make an independent assessment of a citizen's claim of constitutional right when reviewing agency decision-making." *Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979).

---

[10] *See Arent v. Shalala*, 70 F.3d 610, 614-16 (D.C. Cir. 1995); *see also* Gary Lawson, *Outcome, Procedure and Process: Agency Duties of Explanation for Legal Conclusions*, 48 RUTGERS L. REV. 313 (1996). We recognize the difference between *Chevron* step-two review and the APA's arbitrary and capricious review is not always obvious. Indeed, the different standards of review overlap, because both require a reviewing court to decide whether the agency action is "manifestly contrary to the statute" (*Chevron*) or "otherwise not in accordance with law." (APA). *See Arent*, 70 F.3d at 615 & n.6.

III.  ANALYSIS.

A.  HIGH-COST SUPPORT.

1.  METHODOLOGY FOR CALCULATING SUPPORT FOR HIGH-COST AREAS.

a.  FORWARD-LOOKING COST-OF-SERVICE METHODOLOGY.

GTE and Southwestern Bell (collectively "GTE") and the FCC engage in a fairly complex economic debate over the merits of calculating costs using the forward-looking cost models based on the "least cost, most efficient" carrier.[11]  Because incumbent local

_____

[11] As an initial matter, the FCC asks us to dismiss all challenges to its methodology for calculating high-cost support, claiming that such challenges are not ripe in light of the Joint Board's Second Recommended Decision.  The Joint Board advised the agency to make substantial revisions in the high-cost support methodology, including the elimination of the 25%/75% division between federal and state contributions and the modification of the revenue benchmark used to calculate high-cost support.  The FCC accepted these recommendations, and we dismiss challenges to those issues as moot.  *See infra* parts III.A.1.b and c.

But the FCC did not modify other portions of the Order, including its use of forward-looking cost models.  *See Seventh Report and Order* ¶ 48.  We agree with GTE that the mere existence of a Joint Board recommendation does not permit the FCC to block all judicial review of its high-cost methodology, especially after the agency has issued its order implementing these recommendations.

The Supreme Court has consistently endorsed judicial review of final agency actions.  "Although . . . the FCC regulation could properly be characterized as a statement only of intentions, the Court held that 'such regulations have the force of law before their sanctions are invoked as well as after.  When, as here, they are promulgated by order of the Commission and the expected conformity to them causes injury cognizable by a court of equity, they are appropriately the subject of attack . . . .'"  *Abbott Lab. v. Gardner*, 387 U.S. 136, 150 (1967) (quoting *Columbia Broadcasting Sys. v. United States*, 316 U.S. 407, 418-19 (1942)).

Additionally, we consider four factors when evaluating a claim of lack of ripeness in the administrative context: (1) whether the issues are purely legal; (2) whether the issues are based on a final agency action; (3) whether the controversy has a direct and immediate impact on the plaintiff; and (4) whether the litigation will expedite, rather than delay or impede, effective enforcement by the agency.  *See Dresser Indus. v. United States*, 596 F.2d 1231, 1235 (5th Cir. 1979).  To find a case ripe, we require the party bringing the challenge (here, GTE) to establish all four factors in seeking judicial review.  *See Merchants Fast Motor Lines, Inc. v. Interstate Commerce Comm'n*, 5 F.3d 911, 920 (5th Cir. 1993).

(continued...)

14

exchange carriers ("ILEC's") such as GTE will receive their subsidies, under the new system, based on the difference between the costs of providing service to a high-cost region and the revenue that could be derived from that service, GTE fears that using the costs of a hypothetical most-efficient carrier will significantly reduce the amount of universal service support it receives.

i. STATUTORY INTERPRETATION.

The question, of course, is not whether it is good policy for the FCC to use such cost models,[12] but whether the decision to adopt

---

(...continued)

The FCC does not claim that the issues presented are not purely legal, and we have already explained why, under *Abbott Laboratories*, the Order remains a final agency action. There is no indication that the petitioners are currently unaffected by the legal force of the Order. Finally, we agree with GTE that because the FCC has had ample time (three years) and opportunity to implement the Order, judicial guidance on the legality of the Order will not delay or impede the agency's ability to carry out its statutory duties.

[12] GTE refers us to Justice Brandeis's dissent (joined by Justice Holmes) in *Missouri ex rel. Southwestern Bell Tel. Co. v. Public Serv. Comm'n*, 262 U.S. 276 (1922), criticizing use of "fair value" (another version of forward-looking cost models) in ratemaking. GTE notes that Justice Breyer has endorsed Justice Brandeis's criticisms. Even in his separate opinion in *Iowa Utilities*, however, Justice Breyer did not advocate that the Court prohibit the FCC from adopting forward-looking cost models. *See Iowa Utilities*, 119 S. Ct. at 752 (Breyer, J., concurring in part and dissenting in part) ("These examples do not show that the FCC's rules are themselves unreasonable").

Most importantly, the Brandeis criticism of "fair value" has never reflected the view of a majority of the Court, which on several occasions has declined to adopt Justice Brandeis's views on this question. *See Federal Power Comm'n v. Texaco Inc.,* 417 U.S. 380 (1974); *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591 (1944). Instead, the Court consistently has refused to "designat[e] [] a single theory of ratemaking [that] would unnecessarily foreclose alternatives which could benefit both consumers and investors." *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 316 (1989).

(continued...)

this methodology conforms to the plain language of the statute. If the language is ambiguous, we must then ask whether the use of forward-looking cost models is reasonable given the terms of the statute and the deference the FCC must be afforded under *Chevron*. Additionally, we must consider whether the agency's actions in reaching its decision are "arbitrary and capricious" under the APA. *See* 5 U.S.C. § 706(2)(A).

We conclude that the plain language is ambiguous as to whether the FCC's cost models are permitted. We then decide that under *Chevron* step-two, the FCC's forward-looking cost models are authorized under their reasonable interpretations of the statutory language. Finally, we do not conclude that the FCC acted in a "arbitrary and capricious" manner in reaching its decision to adopt forward-looking cost models.

GTE argues that the methodology violates the "equitable and nondiscriminatory" language in § 254(b)(4). We disagree with GTE's claim that the plain language of § 254(b)(4) prohibits the FCC from adopting its methodology.

The section of the statute that GTE relies on represents one of seven principles identified by the statute as the basis for the agency's universal service policies. Rather than setting up

---

(...continued)

In fact, the Court has explicitly sustained similar cost models not based on historical costs. *See Mobil Oil Exploration & Producing Southeast Inc. v. United Distrib. Cos.,* 498 U.S. 211, 224-25 n.5 (1991) (indicating that similar non-historical based cost model was not arbitrary, capricious, or manifestly contrary to the statute at issue.).

16

specific conditions or requirements, § 254(b) reflects a Congressional intent to delegate these difficult policy choices to agency discretion: "The Joint Board and the Commission *shall base policies* for the preservation and advancement of universal service on the following principles . . . ." (Emphasis added.) 47 U.S.C. § 254(b).

Moreover, the FCC has offered reasonable explanations for how its use of the forward-looking cost models cannot be characterized as inequitable and discriminatory. For instance, the FCC points out that all carriers, including interexchange carriers ("IXC's") such as AT&T and MCI, are subject to the same cost methodology and must move toward the same efficient cost level to maximize the benefits of universal service support.

The term "sufficient" appears in § 254(e), and the plain language of § 254(e) makes sufficiency of universal service support a direct statutory command rather than a statement of one of several principles. Still, we do not find that the use of the single word "sufficient," even in the language of command, demonstrates Congress's unambiguous intent regarding the forward-looking cost models. We therefore review under *Chevron* step-two and conclude that the agency has offered reasonable justifications for its adoption of the "most efficient" methodology.

The FCC points to cases in which agencies have adopted similar

17

methodologies to encourage competition.[13] It also argues that nothing in the statute defines "sufficient" to mean that universal service support must equal the actual costs incurred by ILEC's. These reasons suffice to survive the reasonableness requirement of *Chevron* step-two.

To be sure, the FCC's reason for adopting this methodology is not just to preserve universal service. Rather, it is also trying to encourage local competition by setting the cost models at the "most efficient" level so that carriers will have the incentive to improve operations. As long as it can reasonably argue that the methodology will provide sufficient support for universal service, however, it is free, under the deference we afford it under *Chevron* step-two, to adopt a methodology that serves its other goal of encouraging local competition.

ii. "ARBITRARY AND CAPRICIOUS."

Arguing that the FCC has departed from its own stated methodology, GTE charges the agency with "arbitrary and capricious" actions under the APA. *See* 5 U.S.C. § 706(2)(A). The APA's "arbitrary and capricious" standard of review is narrow and requires only a finding that the agency "articulate[d] a rational

---

[13] *See*, *e.g.*, *West Tex. Util. Co. v. Burlington N.R.R.*, Docket No. 41191 (Surface Transp. Bd. May 3, 1996), *aff'd sub nom. Burlington N.R.R. v. Surface Transp. Bd.*, 114 F.3d 206, 213 (D.C. Cir. 1997) (sustaining, as reasonable, agency application of "stand alone cost constraints" based on rates that a hypothetical carrier would have to charge to earn a reasonable return).

18

relationship between the facts found and the choice made." *Harris v. United States*, 19 F.3d 1090, 1096 (5th Cir. 1994).

GTE points out that while the agency has wedded itself to the "most efficient" carrier cost methodology, it used current depreciation schedules to develop its models for projecting forward-looking costs. These schedules are not based on the actual costs of the current regulated system, but, GTE contends, have been artificially deflated by state regulators so that local carriers recover less than they would in a real, competitive market. Using these artificially-deflated schedules in the cost models disadvantages the ILEC's, because they will not be able to recover their capital costs as they would if free from regulation.

Actually, the FCC has departed from its general "most efficient" methodology by making a number of adjustments to its cost model. For instance, instead of assuming the "most efficient" wire center locations in its cost models, the agency simply made calculations based on whatever wire centers already exist. *See* Order ¶ 251(1). This allowance actually benefits the ILEC's.

While GTE argues that the FCC's failure to adhere tightly to its "most efficient" methodology fails the "arbitrary and capricious" test, that test, properly understood, is far less onerous. If the FCC's departures from its methodology "articulate a rational relationship," we will not apply the "arbitrary and capricious" remedy.

19

The FCC seeks to mitigate the effect of the "most efficient" methodology by accounting for wire centers that already exist. Additionally, and contrary to GTE's assertions, the agency is prescribing a range within which the depreciation schedules must fall, rather than simply adopting the schedules that already exist. For the time being, the FCC will rely on the actual depreciation schedules, because it does not see a prospect of significant competition in the near future in the high-cost markets. *See* Order ¶ 250(5). Moreover, the agency has committed itself to re-prescribe the range for these schedules every three years. See *id.* ¶ 250(5) n.662. These reasons establish enough of a "rational relationship" with facts presented for the forward-looking cost methodology to pass the APA's arbitrary and capricious test.[14]

b. METHODOLOGY FOR CALCULATING THE REVENUE BENCHMARK.

GTE challenged the inclusion of revenues from "discretionary" services in the revenue benchmark used to compare costs and

---

[14] GTE claims that implementing the forward-looking cost methodology will force ILEC's to operate at a loss, and this constitutes an unconstitutional taking under *Brooks-Scanlon*. GTE's claim has no merit; it has not shown that a taking has occurred or that any taking will be permanent or would be so serious as to be considered "confiscatory." *See Duquesne*, 488 U.S. at 314. ("[A]n otherwise reasonable rate is not subject to constitutional attack by questioning the theoretical consistency of the method that produced it.").

Unlike the situation in *Brooks-Scanlon*, the circumstance here is that the regulatory entity setting the rules, the FCC, is not requiring the ILEC's to remain open or to charge low rates, thereby forcing them to operate at a permanent loss. *See Continental Airlines v. Dole*, 784 F.2d 1245, 1251 (5th Cir. 1986) (distinguishing *Brooks-Scanlon* where agency required loss-making operation for a limited time only).

revenues for the purposes of universal service support. The Joint Board, however, recently proposed eliminating the entire revenue benchmark in favor of a single national cost benchmark. *See* Second Recommended Decision ¶¶ 41-50. The FCC accepted this recommendation. *See Seventh Report and Order* ¶ 61 ("[W]e reconsider and reject the determination in the *First Report and Order* that federal support for rate comparability should be determined using a revenue-based benchmark.").[15] This decision moots GTE's challenge to the inclusion of discretionary revenues, because no revenues will be used in the calculation of the benchmark.[16]

A case becomes moot if (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. *County of Los Angeles v. Davis*, 440 U.S.

---

[15] Vermont has filed a petition for review of the *Seventh Report and Order* in the District of Columbia Circuit. See No. 99-1243 (D.C. Cir.). Pursuant to 28 U.S.C. § 2349(a), it thereby has vested that court with exclusive jurisdiction to review the *Seventh Report and Order*. Unless the District of Columbia Circuit transfers the petition to this court pursuant to 28 U.S.C. § 2112(a), we lack jurisdiction to consider the order on its merits.

We still retain jurisdiction to the extent that the new order changes or affects the Order that is the subject of this consolidated proceeding. As we explain below, the FCC's repudiation of its revenue benchmarks and the 25% allocation moot the petitioners' challenges for purposes of this appeal. Petitioners, however, are not precluded, by our dismissal in this proceeding, from filing appeals of the new cost-based benchmark and the new allocation methodology in another proceeding.

[16] Mootness goes to the heart of our jurisdiction under Article III of the Constitution. Therefore, we must consider mootness even if the parties do not raise it, because "resolution of this question is essential if federal courts are to function within their constitutional spheres of authority." *North Carolina v. Rice*, 404 U.S. 244, 245 (1971).

625, 631 (1979).[17] The FCC's new approach eradicates any possible effect of discretionary revenues on the levels of the petitioners' universal service support.[18] We therefore dismiss, as moot, GTE's challenge to the use of discretionary revenues in the high-cost support benchmark.

GTE also challenged the FCC's use of a national benchmark for purposes of revenue calculations. Because GTE's challenge focused on the problems of a national *revenue* benchmark, the FCC's elim-

---

[17] Even if these conditions are met, there are at least three exceptions to the mootness doctrine. First, courts may assert jurisdiction if the official action being challenged is capable of "repetition, yet evading review." *See Nader v. Volpe*, 475 F.2d 916, 917 (D.C. Cir. 1973). Second, courts also have adjudicated otherwise moot issues if the defendant has voluntarily ceased the challenged activity to avoid judicial resolution and there is a reasonable possibility that the challenged conduct will resume. *See Gulth v. Kangas*, 951 F.2d 1504, 1507-08 (9th Cir. 1991) (refusing to hold voluntary cessation of prison library restrictions moot in light of long history of policy). Finally, courts have avoided mootness where the mooted issue still has collateral or future consequences. *See Super Tire Eng'g Co. v. McCorckle*, 416 U.S. 115, 122 (1974) (refusing to moot employer's challenge to state benefits for strikers even though strike had ended, because issue would affect employer's future relations with union).

Only the first and second exceptions are arguably applicable to the FCC's new order, and we do not think either exception applies. The "repetition" exception will not apply unless there is a reasonable expectation that the same litigant will again be subjected to the same action. *See DeFunis v. Odegaard*, 416 U.S. 312, 315-17 (1974) (mooting student's lawsuit because he will graduate regardless of outcome of litigation). The second exception requires a showing that the challenged conduct will resume. There is little basis for suggesting that the FCC, after a long and torturous process involving a recommendation from the Joint Board and months of deliberation, will reverse itself on the question of revenue benchmarks.

[18] Reconsideration of agency actions by the implementing agency can moot issues otherwise subject to judicial review because the reviewing court can no longer grant effective relief. *See*, *e.g.*, *Center for Science in the Pub. Interest v. Regan*, 727 F.2d 1161, 1164 (D.C. Cir. 1984) (holding that a change in position of Department of Treasury regarding labeling of alcoholic beverages mooted federal appeal); *see also* 15 JAMES W. MOORE, MOORE'S FEDERAL PRACTICE § 101.96, at 101-179 (3d ed. 1998) ("[A] parallel proceeding in another forum and [] resolution of that controversy in that forum will moot the issues presented in the federal action. . . . regardless of whether or not that parallel forum is an administrative proceeding.").

ination of the revenue benchmark also moots its challenge to the national benchmark.

GTE's basic attack on the national revenue benchmark is that ILEC's operating in states with below-average revenues will be systematically undercompensated by a universal service support system based on a national revenue benchmark. But none of these arguments necessarily applies to a cost-based national benchmark.[19] Indeed, the FCC adopted the cost-based national benchmark because it agreed that "revenues may not accurately reflect the level of need for support to enable reasonably comparable rates because states have varying rate-setting methods and goals." *Seventh Report and Order* ¶ 62.

Because the subject matter of GTE's appealSSa national *revenue* benchmarkSSno longer has any legal force, "[a]ny further judicial pronouncements . . . would be purely advisory." *See Center for Science in the Public Interest*, 727 F.2d at 1164. "We cannot assume jurisdiction to decide a case on the ground that it is the *same* case as one presented to us, when it is admitted that it is not and when it presents different issues." *Id.* at 1166 n.6 (emphasis added). Therefore, we also dismiss, as moot, the

---

[19] *Accord Center for Science in the Pub. Interest*, 727 F.2d at 1164 ("Most of the issues presented in these appeals are not necessarily pertinent to examination of the second [administrative action] and may well prove irrelevant in that context.").

challenges to the FCC's national revenue benchmark.[20]

### c. Limiting the Federal Mechanism to Twenty-five Percent of Universal Service Costs.

The third step in the FCC's methodology for calculating support to high-cost, non-rural areas allocates 25% of the funding responsibility to the agency, leaving 75% to be provided by the states. In other words, only 25% of the overall funds for the explicit universal support program for high-cost areas will be provided from the funds collected from interstate telephone calls; the rest must be provided by the states, usually through charges on

---

[20] Our conclusion regarding mootness does not conflict with *Natural Resources Defense Council v. EPA*, 489 F.2d 390 (5th Cir. 1974), in which we refused to moot a challenge to the EPA's approval of Georgia's Clean Air Act implementation plan despite the EPA's later decision to withdraw its approval. Because the EPA's reasons for withdrawing approval showed that it still fundamentally disagreed with the petitioners' interpretation of the Clean Air Act's requirements, we asserted jurisdiction.

In this case, the FCC's new order not only alters, but explicitly repudiates, the reasoning behind its use of *revenues* in calculating the benchmark. All of the petitioners' challenges to the benchmark calculations focused on the unreliability or unfairness of such revenue-based calculations. By eliminating the use of *revenues*, the petitioners and the FCC no longer fundamentally disagree on the problems that revenues cause in calculating the benchmark for high-cost support.

Thus, *Natural Resources Defense Council* does not conflict with the reasoning of *Center for Science in the Public Interest*, 727 F.2d at 1166, in which the court mooted a challenge after the Treasury had implemented a new, superseding regulation containing different reasoning and substantive provisions different from the challenged regulation. In both cases, the courts analyzed whether the intervening agency action represented a substantive shift in an agency's interpretation of its statutory duties.

24

intrastate service.  Certain states,[21] GTE, and Kansas and Vermont[22] challenged this allocation on statutory grounds.  Specifically, they question the 25% rule for failing to provide "sufficient" support under § 254(e).  Kansas and Vermont also challenged the FCC's 25% allocation decision for lack of notice and for failing to ensure reasonable comparability between rural and urban rates.

As in the case of arguments against the revenue benchmark, we do not consider these challenges, because the FCC has accepted the Joint Board's recommendation to scrap the 25%/75% rule.[23]  The *Seventh Report and Order* proposes a new methodology that places "no artificial limits on the amount of federal support that is available" when a state cannot by itself maintain reasonable comparability.  *Seventh Report and Order* ¶ 34.  This new framework is "a different regulation, containing on its face reasoning not previously articulated by the agency as its policy."  *Center for Science in the Pub. Interest*, 727 F.2d at 1166.  Therefore, we

---

[21] Nine state commissionsSSfrom Texas, California, Florida, Iowa, Louisiana, New York, Nevada, Pennsylvania, and South DakotaSShave presented a joint appeal, and we refer to them as "the states."

[22] The state commissions of Kansas and Vermont filed a separate appeal. Although both Kansas and Vermont challenge the 25% allocation, only Vermont maintains its challenge to the FCC's transitional support rules for rural carriers.  *See infra* part III.A.6.c.i.

[23] *See Seventh Report and Order* § 3 ("We explicitly reconsider and repudiate any suggestion in the *First Report and Order* that federal support should be limited to 25 percent of the difference between the benchmark and the forward-looking cost estimates. . . .").

dismiss the challenges by all of the petitioners as moot.[24]

### d. PROPERLY CONSULTING WITH THE JOINT BOARD BEFORE AMENDING JURISDICTIONAL SEPARATIONS RULES.

GTE raises an administrative procedural objection to the FCC's adoption of new jurisdictional separations rules[25] that propose to end existing high-cost fund support for non-rural carriers on January 1, 1999.[26]  Instead of arguing that the new rule is arbitrary and capricious, GTE claims that the agency failed properly to refer the matter to the Joint Board, in violation of 47 U.S.C. § 410(c), which states that "[t]he Commission shall refer any proceeding regarding the jurisdictional separation of common carrier property and expenses between interstate and intrastate operations . . . to a Federal-State Joint Board."

The FCC responds that it did make a general referral to the Joint Board in March 1996 and that the Joint Board subsequently

---

[24] Vermont invites us to review the *Seventh Report and Order*'s interpretation of reasonable comparability in the context of that recent order's revised approach to allocating costs between the different states and between the state and federal funds.  To the extent that Vermont's "reasonable comparability" arguments were based on a challenge to the 25% allocation, we dismiss its arguments as moot.  To the extent its arguments focused on the alleged failure of the FCC to articulate a definition of "reasonable comparability," we would have to examine the merits of the *Seventh Report and Order*.  As we explained, *supra* n. 16, we cannot review the merits of that order, because we lack jurisdiction over the merits of the new allocation methodology until it is transferred to this court by the District of Columbia Circuit.

[25] "Beginning January 1, 1999, non-rural carriers shall no longer receive support pursuant to this [program]." 47 C.F.R. § 36.601(c).

[26] This implementation date has now been delayed until January 1, 2000. *See Seventh Report and Order* ¶ 5.

26

recommended that the agency replace the existing support mechanisms for non-rural carriers with a new universal service system. The plan to replace the existing support mechanism, the FCC argues, requires a change in the method of jurisdictional separation, and by recommending the plan, the Joint Board had already considered the jurisdictional effects.[27]

GTE and the FCC disagree on the level of specificity needed to fulfill the Joint Board consultation requirement of § 410(c). GTE argues that simply identifying the broad subject of universal service reform did not raise the issue of altering the system that is used to shift costs in many high-cost areas to the interstate jurisdiction. In particular, GTE contends that the Joint Board failed to consider the *amounts* of the fund allocation between the interstate and intrastate jurisdictions when it considered the plan to implement a new support mechanism.

Although the FCC does not have to raise every possible detail in its referral to the Joint Board, it must show that the Joint Board was aware of the effects on the jurisdictional separations rules of replacing the existing high-cost support system. The plain language of the statute shows that any shift in the

---

[27] Jurisdictional separations rules are part of a process whereby it "may be determined what portion of an asset is employed to produce or deliver interstate as opposed to intrastate service." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 356 (1986). Section 410(c) requires the FCC to consult the Joint Board, but it does not "dictate how costs must be recovered . . . ." *See National Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095, 1112 n.19 (D.C. Cir. 1984).

allocation of jurisdictional responsibility lies at the heart of § 410(c)'s consultation requirement.

The Joint Board was aware that replacing the existing high-cost support system will affect the jurisdictional separations rules. This is shown by the fact, for instance, that the Joint Board made a detailed discussion of the current jurisdictional separations rules, acknowledging that they "currently assign 25 percent of each LEC's loop costs to the interstate jurisdiction." *See* First Recommended Decision ¶ 188.

In discussing the comments submitted by affected parties, the Joint Board recognized that the jurisdictional separations rules are part of the old regime of "embedded" or "historical" costs. *See id.* ¶ 207. Thus, the Joint Board does seem to recognize that the jurisdictional separations rules are part of the old "embedded cost" system and were developed in the context of allocating the actual costs of developing the local and long-distance networks. By recommending replacing the historical cost system with a forward-looking "most efficient" cost model, the Joint Board must have considered that the jurisdictional separations rules no longer would apply in the same way. Although no detailed discussion appears in the First Recommended Decision, the Joint Board's recognition that the jurisdictional separations rules would be affected by adopting a new cost model fulfills § 410(c)'s

28

consultation requirement.[28]

### 2. ELIGIBILITY REQUIREMENTS FOR CARRIERS SEEKING UNIVERSAL SERVICE SUPPORT.

The states and intervenor Southwestern Bell ("SBC") challenge the FCC's reading of the Act's provisions governing eligibility requirements for carriers seeking universal service support. In general, they question the agency's interpretation of § 214(e) as too narrow and restrictive of the ability of state commissions to set their own criteria and exercise their own discretion over a carrier's eligibility.

### a. LIMITING THE CRITERIA THAT STATE COMMISSIONS MAY CONSIDER WHEN ASSESSING A CARRIER'S ELIGIBILITY.

Section 214(e) governs the designation of carriers eligible to receive federal universal service support. Section 214(e)(1)(A) and (B) set out the eligibility requirements, and § 214(e)(2)[29]

---

[28] The FCC did not arbitrarily and capriciously fail to explain the reason for its amendment of rule 36.601(c). It stated that the new universal service mechanism will replace the old high-cost fund subsidies and that the change will occur on January 1, 1999 (later extended to July 1, 1999 and then to January 1, 2000). The agency's general explanations of the effect of the new support mechanism provide enough of a reason to survive GTE's attack.

[29] The subsection reads:

A State commission shall upon its own motion or upon request designate a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the State commission. Upon request and consistent with the public interest, convenience, and necessity, the State commission may, in the case of an area served by a rural telephone company, and shall, in the case of all other areas, designate more than one common carrier as an eligible telecommunications carrier for a service area designated by

(continued...)

29

governs the designation of eligible carriers by state commissions.

In the Order, the FCC interpreted § 214(e)(2) in this way. With limited exceptions for rural areas, a state commission has no discretion when assessing a carrier's eligibility for federal support. If a carrier satisfies the terms of § 214(e)(1), a state commission *must* designate it as eligible. Thus, the FCC ruled that a state commission may not impose additional eligibility requirements on a carrier seeking universal service support in non-rural service areas. *See* Order ¶ 135. The agency does permit the states to impose service quality obligations on local carriers if those obligations are unrelated to a carrier's eligibility to receive federal universal service support. According to the FCC, this interpretation "gives effect to the unambiguously expressed intent of Congress." *See Chevron*, 467 U.S. at 842-43.

The states and SBC offer two lines of attack. First, they argue that the plain language of § 214(e)(2) does not support the FCC's blanket prohibition on additional state eligibility requirements. Second, they say that the FCC exceeded its jurisdictional authority, in violation of 47 U.S.C. § 152(b), by purporting to interfere with the states' regulation of intrastate service. Because we conclude that the agency erred in prohibiting

(...continued)
a State commission, so long as each additional requesting carrier meets the requirements of paragraph (1). Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the State commission shall find that the designation is in the public interest.

the states from imposing additional eligibility requirements, we do not reach the states' jurisdictional challenges.

On the plain language front, the states argue that § 214(e)(2) does not unambiguously prohibit them from regulating carriers receiving federal universal support. Specifically, they contend that Congress did not mean to prohibit the states from imposing service quality standards on eligible carriers. According to the states, the language on which the FCC relies§§"[a] State Commission shall upon its own motion or upon request designate a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier"§§does not expressly circumscribe state authority to add additional eligibility requirements.

The agency's best hope for express authority for its action rests on the statute's use of the word "shall" in § 214(e)(2). Generally speaking, courts have read "shall" as a more direct statutory command than words such as "should" and "may."[30] Though we agree that the use of the word "shall" indicates a congressional command, nothing in the statute indicates that this command prohibits states from imposing their own eligibility requirements. Instead, we read § 214(e)(2) as addressing *how many* carriers a state may designate for a given service area, and not how much discretion a state commission retains to impose eligibility standards.

---

[30] *See MCI Telecomm. Corp. v. FCC*, 765 F.2d 1186, 1191 (D.C. Cir. 1985) (holding that "shall" is "the language of command").

31

The first sentence requires state commissions to designate at least one common carrier as eligible, but that carrier must still meet the eligibility requirements in § 214(e)(1). The second sentence then confers discretion on the states to designate more than one carrier in rural areas, while requiring them to designate eligible carriers in non-rural areas consistent with the "public interest" requirement. Nothing in the statute, under this reading of the plain language, speaks at all to whether the FCC may prevent state commissions from imposing additional criteria on eligible carriers.[31]

Thus, the FCC erred in prohibiting the states from imposing additional eligibility requirements on carriers otherwise eligible to receive federal universal service support. The plain language of the statute speaks to the question of *how many* carriers a state commission may designate, but nothing in the subsection prohibits the states from imposing their own eligibility requirements.[32] This reading makes sense in light of the states' historical role in

_____

[31] To be sure, if a state commission imposed such onerous eligibility requirements that no otherwise eligible carrier could receive designation, that state commission would probably run afoul of § 214(e)(2)'s mandate to "designate" a carrier or "designate more than one carrier."

[32] Additionally, §152(b) of Act instructs us to construe the Act to avoid giving the FCC jurisdiction over "charges, classifications, practices, services, facilities, or regulations for and in connection with intrastate communications services. . . ." 47 U.S.C. § 152(b). *See Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 376 n.5 (1988) ("[Section] 152(b) not only imposes jurisdictional limits on the power of a federal agency, but also, by stating that nothing in the Act shall be construed to extend FCC jurisdiction to intrastate service, provides its own rule of statutory construction."); *see also* discussion of "no disconnect" rule, *infra* part III.A.3.

32

ensuring service quality standards for local service. Therefore, we reverse that portion of the Order prohibiting the states from imposing any additional requirements when designating carriers as eligible for federal universal service support.

### b. THE TERMS OF SECTION 214(e)(5) GOVERNING THE DEFINITION OF SERVICE AREAS.

In their initial brief, the states argued that the FCC had impermissibly encroached on their exclusive authority to designate service areas for universal service support. The FCC, however, pointed out that ¶ 185 of the Order had only *encouraged* the states to make certain decisions[33] when designating service areas. The agency explicitly denies that the paragraph requires the states to follow its "encouragements." Thus, it appears that the states misinterpreted the FCC's intentions in ¶ 185 and that there is no issue left for us to address.

The states, however, continue to contest one aspect of the Order regarding the definition of service areas. The FCC maintains that it may establish a different definition of service areas for rural carriers, with the agreement of the states, without having to

---

[33]    In order to promote competition, the FCC encourages states to adopt the existing study areas of ILECs as service areas for non-rural areas because it would create a significant barrier to entry. The FCC further encourages states to consider designating service areas that the ILECs have not traditionally served, this limiting the ILEC advantage over new entrants.

Order ¶ 185.

submit such a new definition first to the Joint Board.  The states argue that the plain language of § 214(e)(5) allows the agency to act only "after taking into account recommendations of [the Joint Board] . . . ."

The FCC has two procedural responses and one substantive defense.  Because we agree with the FCC that the states have no standing, we do not reach the FCC's other defenses.

The agency argues that the states have no standing to challenge its ruling, because the states have failed to show any harm.[34] After all, as the FCC points out, it must still garner the approval of each respective state before a rural service area can be redefined.  The states argue that they are harmed because the state members of the Joint Board are denied a chance to participate in the decisionmaking process, so the states are less able to coordinate with each other.  They further contend that bypassing the Joint Board denied the states any meaningful participation in revising service area definitions for rural territories.

This claim is weak, because the states' independent ability to veto particular service areas seems to provide them with a substantial amount of "meaningful participation."  This is unlike the situation in the cases the states rely on, in that the states here are not challenging a federal preemption order that threatens their

---

[34] We review the FCC's standing defense, like all constitutional questions, under a *de novo* standard of review.  *See* 5 U.S.C. § 706 (stating that "a reviewing court shall decide all relevant questions of law [and] interpret constitutional and statutory provisions").

sovereign authority.  *See California v. FCC*, 75 F.3d 1350, 1361 (9th Cir. 1996).  Therefore, the states lack standing to challenge this portion of the Order.

c.  Declining To Require Eligible Carriers<br>To Offer Supported Services on an Unbundled Basis.

GTE argues that the FCC's failure to require carriers to "unbundle" their offerings when receiving universal service support violates the congressional intent expressed in § 214(e)(1) under *Chevron* step-one.  "Bundling" refers to a carrier's practice of offering different services together as one package.  For instance, a carrier might offer basic phone service as part of a package that includes call-waiting and voicemail.

GTE fears that a new carrier could "cherry pick" high-profit customers by offering only bundled local telephone service packages.  Because the intended beneficiaries of universal service are, by definition, less able to afford even basic service, offering expensive bundled packages will allow new carriers to steal wealthier, low-cost customers while leaving ILEC's such as GTE to provide service to everyone else.  GTE reasons that Congress, by requiring carriers receiving federal universal service support to advertise the availability of its supported services, intended to require new carriers to participate in universal serviceSSan intent that would be thwarted by Allowing the new carriers to offer bundled services.

35

The FCC responds that the plain language of the statute is satisfied as long as a carrier offers "services that are supported by Federal universal service mechanisms." 47 U.S.C. 214(e)(1)(A). Except for the advertising requirement, the statute makes no mention of "bundling" or other eligibility criteria. In fact, the FCC argues that because of the exclusive grant of eligibility authority conferred on the states by § 214(e)(2), it *cannot* impose additional eligibility criteria. Because the statute is silent on the question of bundling, and because the statute seems to prohibit further eligibility criteria, the agency asks us to give deference to its interpretation of § 214(e) under *Chevron* step-two.

We agree that the statute's plain language does not reveal Congress's unambiguous intent. It is not evident, however, that the FCC's interpretation of the statute meets even the minimum level of reasonability required in step-two review.

Section 214(e)(1) plainly requires carriers receiving universal service support to offer such supported services to as many customers as possible. Thus, an eligible carrier must offer such services "throughout the service area" and "advertise the availability of such services." This requirement makes sense in light of the new universal service program's goal of maintaining affordable service in a competitive local market. Allowing bundling, however, would completely undermine the goal of the first two requirements, because a carrier could qualify for universal

36

service support by simply offering and then advertising expensive, bundled services to low-income customers who cannot afford it.

The FCC suggests that GTE's problems stem not from bundling but from state-imposed "carrier of last resort" ("COLR") requirements, which prohibit ILEC's such as GTE from disconnecting low-profit consumers and leave ILEC's vulnerable to outside competition. But the elimination of COLR requirements would only further undermine the goal of making basic services available to low income consumers and those in "rural, insular, and high cost areas." *See* 47 U.S.C. § 254(b)(3). This again would violate the express intent of the universal service program. Without a better explanation for its unreasonable interpretation, we would be inclined to find the FCC's implementation "arbitrary and capricious and manifestly contrary to the statute." *See Chevron*, 467 U.S. at 844.

Fortunately, the agency also has explained that "only an eligible carrier that succeeds in attracting and/or maintaining a customer base to whom it provides universal service will receive universal service support." Order ¶ 138. Therefore, it reasons that if offering only bundled services would price low-income customers out of the market, the carrier offering bundled services would eventually lose universal service support. Thus, the FCC can avoid the problem of providing universal service support to carriers that do not serve high-cost customers for which the support

37

is intended.  This explanation supports the FCC's claim that its decision to allow bundling is reasonable under *Chevron* step-two review.

Though the decision is a close one, we conclude that the FCC's refusal to require eligible carriers to provide unbundled services is neither "arbitrary, capricious," nor "manifestly contrary to the statute."  *See Chevron*, 467 U.S. at 844.  Because the agency will prevent companies from using bundling to receive federal support while avoiding high-cost customers, we do not find its interpretation "so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs.' Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

3.  AUTHORITY TO PROHIBIT CARRIERS FROM DISCONNECTING LOCAL SERVICE
    TO LOW-INCOME CONSUMERS WHO FAIL TO PAY TOLL CHARGES.

Bell Atlantic and the states challenge the FCC's adoption of a regulation[35] prohibiting carriers receiving universal service support from disconnecting Lifeline services[36] from low-income consumers who have failed to pay toll charges.  *See* Order ¶ 390. The petitioners charge that the "no disconnect" rule exceeds the

---

[35] 47 C.F.R. § 54.401(b).

[36] The Lifeline program refers to the FCC's efforts to expand telephone services to qualifying low-income subscribers.  The agency defines Lifeline services to include single-party service, voice-grade access to the public switched telephone network, BTMF or its functional digital equivalent, access to directory assistance, and toll-limitation services.  *See* Order ¶ 390.

agency's jurisdictional authority under § 2(b) of the 1934 Act,[37] which prohibits FCC regulation of intrastate telecommunications service. Because the plain language of the statute expresses Congress's unambiguous intent, we review the agency's interpretation under *Chevron* step-one.

The agency has three responses. First, it argues that § 2(b) does not apply where Congress has given the FCC an "unambiguous or straightforward" grant of authority. *See Louisiana Pub. Serv. Comm'n,* 476 U.S. at 377. The agency argues that Congress granted such express authority in § 254(b)(3), which directs the FCC to base its policies on the principle that "low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services . . . ."

As we have discussed, § 254(b) identifies seven principles the FCC should consider in developing its policies; it hardly constitutes a series of specific statutory commands. Indeed, we have avoided relying on the aspirational language in § 254(b) to bind the FCC to adopt certain cost methodologies for calculating universal service support.[38]

Just as we declined to read § 254(b) as an inexorable statu-

---

[37] "[N]othing in this subchapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier . . . ." 47 U.S.C. § 152(b) (as amended).

[38] *See supra* part III.A.1.a.i.

tory command against the FCC, we decline to read it as a grant of plenary power overriding other portions of the Act. The agency has no "unambiguous or straightforward" grant of authority to override the limits set by § 2(b), and, accordingly, it has no jurisdiction to adopt the "no disconnect" rule on the basis of the vague, general language of § 254(b)(3).[39]

Second, the FCC contends that the petitioners' jurisdictional challenge is inapposite because the "no disconnect" rule does not purport to regulate intrastate service, but merely prevents the disconnection of interstate service (and, as a consequence, of intrastate service) for failure to pay toll charges.[40] As Bell Atlantic rightly responds, however, the "no disconnect" rule is a "regulation," because it dictates the circumstances under which local service must be maintained. Therefore, the FCC, by issuing the rule, has acted "with respect to" and "in connection with" interstate service within the meaning of § 2(b).

The FCC points out that even if the "no disconnect" rule is a

_____

[39] The SBC intervenors challenge a related FCC rule prohibiting the practice of requiring deposits from customers initiating service with toll-blocking for interstate service. Unfortunately for SBC, none of the petitioners on this issue (the states and Bell Atlantic) raised a challenge to this similar but separate rule in the FCC proceeding. Therefore, we cannot consider it on appeal. *See United Gas Pipe Line Co. v. FERC*, 824 F.2d 417, 437 (5th Cir. 1987).

[40] Bell Atlantic argues that the FCC has waived this argument on appeal. We do not agree. The FCC's brief states that the "no disconnect" rule "does not purport to regulate intrastate service . . . but merely to prevent the disconnection of service (including interstate access service) to customers who have failed to pay toll charges." Though weak, this statement preserves the FCC's attempt to exceed its jurisdictional boundaries on the ground that it cannot regulate an interstate matter without also regulating an intrastate matter.

40

"regulation" within the meaning of § 2(b), courts have sustained agency jurisdiction over similar rules under the "impossibility" exception. In *North Carolina Utils. Comm'n v. FCC*, 552 F.2d 1036 (4th Cir. 1977), the court upheld FCC regulations permitting local subscribers to connect their telephones to the local loop to make interstate calls. North Carolina previously had required subscribers to use leased telephones and argued that § 2(b) prevented FCC intervention because the vast majority of these calls were intrastate. The court rejected this argument, holding that "the FCC has jurisdiction to prescribe the conditions under which terminal equipment may be interconnected with the interstate telephone line network." *Id.* at 1048.

Essentially, the FCC asks us to find that the "no disconnect" rule, aimed at regulating interstate service, is impossible to separate from intrastate service. In similar cases, the District of Columbia Circuit has permitted the FCC to intervene in relatively localized service issues[41] and has developed a useful framework for analyzing what the petitioners refer to as the "impossibility" exception to § 2(b). *See Public Serv. Comm'n v. FCC ("Maryland PSC")*, 909 F.2d 1510, 1515 (D.C. Cir. 1990).

To permit the FCC to preempt state regulation of whether to cut off low-income subscribers, that circuit requires the agency to

---

[41] *See, e.g., Public Util. Comm'n v. FCC*, 886 F.2d 1325 (D.C. Cir. 1989); *Illinois Bell Tel. Co. v. FCC*, 883 F.2d 104 (D.C. Cir. 1989); *National Ass'n of Regulatory Util. Comm'rs v. FCC*, 880 F.2d 422 (D.C. Cir. 1989).

show that "(1) the matter to be regulated has both interstate and intrastate aspects; (2) FCC preemption is necessary to protect a valid federal regulatory objective; and (3) state regulation would negate the exercise by the FCC of its own lawful authority because regulation of the interstate aspects of the matter cannot be unbundled from regulation of intrastate aspects." *Maryland PSC*, 909 F.2d at 1515 (internal quotations and citations omitted). This framework creates a properly narrow exception to § 2(b) that allows the FCC to preempt state regulation only when it has shown it cannot carry out its authorized federal objectives without encroaching on state autonomy.

Applying this framework to the "no disconnect" rule, we agree with Bell Atlantic that the FCC has failed to show why allowing the states to control disconnections from local service would "negate the exercise of the FCC's lawful authority . . . ." As Bell Atlantic points out, the agency offered only a brief explanation of what lawfully authorized federal objectives are being served by the "no disconnect" rule and why it is necessary to preempt local authority to achieve these objectives.

In the Order, the FCC simply states that the "no disconnect" rule advances its goal of increasing subscribership and that it will improve the competitiveness of the market for billing and collection of toll charges. *See* Order ¶¶ 390-391. But the agency has not adequately explained, in either its brief or its Order, why

42

these goals would be "negated" by allowing the states to control disconnection of local subscribers. In contrast to what occurred in *Maryland PSC*, where the court allowed the FCC to assert jurisdiction to prevent ILEC's from shifting local costs to interstate consumers, the FCC has offered no similar explanation of how protecting interstate service *requires* imposition of a "no disconnect" rule. Therefore, we decline to allow the agency to assert jurisdiction over the disconnection of local service based on the impossibility exception.

Finally, the FCC argues that in the wake of *Iowa Utilities*, it has jurisdiction over all areas, including intrastate matters, to which the Act applies. In *Iowa Utilities*, the Court rejected jurisdictional challenges to the portions of the FCC's *Local Competition Order* implementing §§ 251 and 252 of the Act, which govern the interconnection of new local service carriers with the ILEC's and establish procedures for negotiating, arbitrating, and approving any interconnection agreements. As in the instant case, petitioners challenged the FCC's jurisdiction to implement the Act, arguing that much of the authority to enforce the provisions (§§ 251 and 252) remain with the state commissions by virtue of § 2(b). Specifically, they contended that the Act gives the FCC jurisdiction over intrastate matters only when the statute explicitly applies to intrastate services and specifically confers agency jurisdiction over intrastate services.

43

The Court brushed aside these attempts to raise the § 2(b) jurisdictional fence and squarely held that "§ 201(b)[42] *explicitly* gives the FCC jurisdiction to make rules governing matters to which the 1996 Act applies." *Iowa Utilities*, 119 S. Ct. at 730. Though § 2(b)'s language stating that "nothing in this Act shall be construed to apply or to give the Commission jurisdiction" implies that FCC jurisdiction does not always follow where the Act applies, the Court held that "the term 'apply' limits the substantive reach of the statute . . . and the phrase 'or Commission jurisdiction' limits . . . the FCC's *ancillary* jurisdiction." *Id.* at 731. Relying on this holding, the FCC argues that because § 254 *applies* to intrastate as well as interstate matters, § 201(b) confers the necessary jurisdiction to implement the "no disconnect" rule.

Though the Court's broad language seems to support the FCC's position, Bell Atlantic finds comfort in the Court's preservation of *Louisiana PSC*. In reconciling its holding with *Louisiana PSC*, the Court held that the FCC must show that the meaning of a statutory provision *applies* to intrastate matters in an "unambiguous and straightforward" manner as "to override the command of § 2(b)." *Iowa Utilities*, 119 S. Ct. at 731 (quoting *Louisiana PSC*, 476 U.S. at 377). If the agency fails in this initial task, it cannot use its normally broad regulatory authority

---

[42] "The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this Act." 47 U.S.C. § 201(b).

to assert what is now only *ancillary* jurisdiction because of the still-intact jurisdictional fence created by § 2(b). *See id.* Therefore, after *Iowa Utilities*, § 2(b) still serves as (1) a rule of statutory construction[43] requiring the FCC to find unambiguous statutory authority *applying* to intrastate matters and (2) a jurisdictional barrier restricting the agency from using its plenary authority to assert *ancillary* jurisdiction by "taking intrastate action solely because it further[s] an interstate goal." *See Iowa Utilities*, 119 S. Ct. at 731 (citing *Louisiana PSC*, 476 U.S. at 374).

The question is whether § 254 does indeed "apply" to intrastate matters in a sufficiently "unambiguous" manner. Without such a finding, *Iowa Utilities* flatly holds that the FCC cannot use its plenary authority to assert ancillary jurisdiction.

Unfortunately, *Iowa Utilities* provides little guidance for resolving the question whether § 254 applies to intrastate ser-vices. For the Supreme Court, "the question . . . is not whether the Federal Government has taken the regulation of local tele-communications competition away from the States. With regard to the matters addressed by the 1996 Act, it unquestionably has." *Iowa Utilities*, 119 S. Ct. at 730 n.6. The Court did not further

---

[43] *Accord Louisiana PSC*, 476 U.S. at 376 n.5 ("[Section] 152(b) not only imposes jurisdictional limits on the power of a federal agency, but also, by stating that nothing in the Act shall be construed to extend FCC jurisdiction to intrastate service, provides its own rule of statutory construction.")

explain why it felt §§ 251 and 252 "unquestionably" applied to intrastate matters.

The FCC bases its contention that § 254 plainly applies to intrastate as well as interstate matters on § 254(b)(3),(c), and (j). According to the agency, § 254(b)(3) applies to intrastate service by stating that "low income consumers . . . should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services."

The use of the word "including," the FCC argues, indicates that the object of § 254 is to provide access to more than just interexchange services. Furthermore, § 254(c) instructs the agency to consider, in the process of establishing what constitutes universal service, whether such services "have . . . been subscribed to by a substantial majority of residential customers." Finally, § 254(j) specifically preserves the Lifeline Assistance program, which has always provided subsidies for both intrastate and interstate services.

We have already discussed our reluctance to rely on the aspirational language of § 254(b).[44] Moreover, the phrase "including interexchange carriers" cannot be said unambiguously to mean that § 254 applies to local services, and § 254(c)'s mention of a "majority of residential customers" is far from straightforward.

---

[44] *See supra* part III.A.3.

Neither is there much guidance from § 254(j), which specifically protects the Lifeline Assistance program from being affected by any other part of § 254 but does not in any way clarify to what degree § 254 applies to intrastate universal service.

Instead, there is substantial support in the statute for a dual regulatory structure in the administration of the universal service program. Section 254(d) specifically instructs interstate carriers to contribute to the FCC's universal service mechanisms, while § 254(f) instructs intrastate carriers to contribute to the states' individual universal service mechanisms. This section contains the only discussion of intrastate universal service mechanisms and directs intrastate carriers to report to the states rather than to the FCC.

In light of *Iowa Utilities* and *Louisiana PSC*, therefore, we conclude that, "while it is, no doubt, possible to find some support in the broad language of the section for [the FCC's] position, we do not find the meaning of the section so unambiguous or straightforward as to override the command of § 152(b)." *Louisiana PSC*, 476 U.S. at 377. Unlike §§ 251 and 252, which were solely concerned with intrastate issues (i.e., interconnection of new entrants into the local telephone market), § 254 applies to both interstate and intrastate services. It does so, however, only to the extent that it gives exclusive authority over intrastate contributions to the state commissions. We find it incongruous to

47

use this explicit limitation on FCC authority as the hook to provide it with jurisdiction.

Therefore, the FCC exceeded its jurisdiction when it imposed the "no disconnect" rule. Because there is no express grant of statutory authority, a proper showing of "impossibility," or a persuasive explanation of how § 254 applies to intrastate service, we reverse, for want of agency jurisdiction, those portions of the Order implementing the "no disconnect" rule.

4. RECOVERY OF UNIVERSAL SERVICE CONTRIBUTIONS.

a. REQUIRING INCUMBENTS TO RECOVER CONTRIBUTIONS THROUGH ACCESS CHARGES.

GTE and the FCC again wrangle over the meaning of "explicit" in their dispute regarding the rule requiring most ILEC's to recover their universal service contributions through access charges. GTE contends that the rule violates § 254(e)'s command that any support for universal service be "explicit," because recovering contributions through increased access charges is a form of implicit subsidy.

GTE argues that the rule unfairly disadvantages ILEC's because, unlike their potential new competitors, they cannot recover their universal service contributions through explicit charges on their end-users, but, instead, are required by the FCC to increase their access charges on long-distance service providers. Though they do not necessarily lose out in terms of

48

amounts recovered, GTE fears that this recovery method will put them at a competitive disadvantage because, instead of than seeing the costs of universal service on his bill as an explicit surcharge, an ILEC consumer will pay for the costs of universal service through higher rates.

The FCC advances a different understanding of "explicit." "Regardless of how carriers recover their contributions, the FCC's universal service system 'satisfies the statutory requirement that support be explicit' by requiring each carrier to contribute a specific percentage of its end user revenues" (quoting Order ¶ 854). As long as carriers know exactly how much they are contributing to the support mechanisms, the subsidies are explicit.

The statute provides little guidance on whether "explicit" means "explicit to the consumer" (as urged by GTE) or "explicit to the carrier" (as urged by the FCC). The statute does state, however, that all universal service *support* should be "explicit." We read "explicit" to mean the opposite of "implicit." *See* § 254(e).

By forcing GTE to recover its universal service contributions from its access charges, the FCC's interpretation maintains an implicit subsidy for ILEC's such as GTE. In fact, requiring carriers to recover their contributions from access charges on interstate calls shifts the costs of intrastate universal service to the interstate jurisdiction. These are precisely the sorts of implicit subsidies currently used by the FCC in its DAM weighting program.

49

*See* Order ¶ 212 (discussing rules that permit small LEC's to recover costs for intrastate services from interstate access charges).

We are convinced that the plain language of § 254(e) does not permit the FCC to maintain *any* implicit subsidies for universal service support. Therefore, we will not afford the FCC any *Chevron* step-two deference in light of this unambiguous Congressional intent. Because the agency continues to require implicit subsidies for ILEC's in violation of a plain, direct statutory command, we reverse its decision to require ILEC's to recover universal service contributions from their interstate access charges.

b. REQUIRING INTERSTATE CARRIERS TO REDUCE INTERSTATE ACCESS CHARGES BY THE AMOUNT OF FEDERAL HIGH-COST SUPPORT THEY RECEIVE UNDER THE NEW UNIVERSAL SERVICE SYSTEM.

The states contest an aspect of the Order's effect on interstate access charges, arguing that the requirement that carriers reduce their interstate access charges by the amount of direct federal high-cost support they receive will leave insufficient funds for intrastate universal service. The states make two unconvincing plain-language arguments. First, they point to § 254(b)(5)'s language about "specific, predictable and sufficient" mechanisms to "preserve and advance universal service." As we have observed, § 254(b) identifies a set of principles and does not lay out any specific commands for the FCC. Even § 254(e),

which is framed as a direct, statutory command, is ambiguous as to what constitutes "sufficient" support. Therefore, we do not consider the language an expression of Congress's "unambiguous intent" allowing *Chevron* step-one review, and we review its interpretation for reasonability under *Chevron* step-two.

The states argue that § 254(e) does not permit the application of federal universal service funds for the interstate jurisdiction. In essence, they seek to preserve *state* universal service support by reading the statute to require all high-cost support to remain intrastate. Though this might make compelling policy, nothing in the plain language of § 254(e)[45] unequivocally establishes the states' right to all of the federal universal support funds. The statutory language is at best ambiguous as to Congress's intent, which, under *Chevron* step-two, leaves it to the FCC's reasonable interpretation.

The FCC has offered good reason to believe that its new explicit support through direct subsidies will replace the amounts lost through the reduction of access charges. *See* Report to Congress ¶ 230. To be sure, the states and intervenor NASUCA[46] make a plausible argument that ILEC's will receive less under the new plan than they did through implicit subsidies. As we have

---

[45] "A carrier that receives such support shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended."

[46] National Association of State Utility Consumer Advocates.

51

determined, however, because the FCC has offered reasonable explanations of why it thinks the funds will still be "sufficient" to support high-cost areas, we defer to the agency's judgment of what is "sufficient."

Under the agency's new universal service plan, it is possible that the states will receive less support for intrastate universal service costs than they did under the old plan. While this may seem unfair as a matter of policy, the states have failed to show that the FCC's interpretation, which may possibly result in a reduction of their level of support, is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844.


### 5. CONTRIBUTIONS.

#### a. REQUIRING CMRS CARRIERS TO CONTRIBUTE TO THE FEDERAL UNIVERSAL SERVICE FUND.[47]

Celpage Inc., a paging carrier, and intervenors representing a number of wireless telecommunications companies (referred to in general as commercial mobile radio service or "CMRS" providers), challenge the FCC's decision to subject them to the universal service support scheme. Celpage raises a number of constitutional and statutory challenges to the decision to require their contributions to the universal service fund. Specifically, Celpage

---

[47] Intervenor American Cable Television Association challenges the FCC for failing to meet the requirements of the Regulatory Flexibility Act before promulgating the Order. None of the petitioners raises this argument, nor does the FCC respond to it, and therefore we do not consider it. *See* discussion of MCI's intervenor argument, *infra* part III.A.6.b.

attacks the agency's universal service contribution requirement as an unconstitutional tax, a violation of equal protection, and an uncompensated taking. Additionally, Celpage charges that the FCC's action violates § 254's plain language, is arbitrary and capricious, and does not meet the agency's own principle of competitive neutrality.

i. CONSTITUTIONAL CHALLENGES.

(a). UNCONSTITUTIONAL TAX.

There are two ways in which the universal service contribution requirement for paging carriers could constitute an unconstitutional tax. First, the FCC's application of the universal service requirement to paging carriers such as Celpage might be an unconstitutional delegation of Congress's exclusive taxing power under the Taxing Clause.[48] Alternatively, because the Act originated in the Senate,[49] its requirement of universal service contributions from paging carriers might violate the Origination Clause's requirement that all "[b]ills for raising [r]evenue" originate in the House of Representatives"[50]

Despite their similarities, the Taxing Clause and Origination

---

[48] U.S. CONST., art. I, § 8, cl. 1 ("The Congress shall have Power to lay and collect Taxes. . . .").

[49] *See* Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) (enacting S. 652).

[50] U.S. CONST., art. I, § 7, cl. 1 ("All Bills for Raising Revenue shall originate in the House of Representatives.")

Clause challenges to the universal service contribution system represent separate lines of analysis.[51]  In its initial brief, however, Celpage raises only the Origination Clause challenge and does not raise a Taxing Clause claim until its reply brief. Therefore, we will not consider it,[52] and we focus our efforts on Celpage's claim that the universal service contribution requirement, as applied to paging carriers, is a violation of the Origination Clause.[53]

Unfortunately for Celpage, its Origination Clause claim cannot survive *United States v. Munoz-Flores*, 495 U.S. 385, 398 (1990). There, the Court refused to find that a special assessment on certain federal criminals for a "crime victim's" fund is a tax, be-

---

[51] The Taxing Clause analysis focuses on whether the assessment is a tax or a fee.  This question is usually resolved based on whether the revenues are used to primarily defray the expenses of regulating the act. *See National Cable Television Ass'n v. United States*, 415 U.S. 336, 340 (1974).  If it is a tax, then courts will ask whether it has been properly delegated. *Id.*  On the other hand, the Origination Clause analysis asks whether (1) the revenues generated from the assessment are for general revenues or for a particular program and (2) there is a connection between the payors and the beneficiaries of the program. *See Munoz-Flores*, 495 U.S. at 397. *See infra* part III.B.1.c. n.83.

[52] Generally, we do not consider arguments raised for the first time in a reply brief. *See* FED. R. APP. P. 28(c).  Even if Celpage's Taxing Clause argument were properly before us, we find no basis for reversal.  As applied to paging carriers, the universal service contribution qualifies as a fee because it is a payment in support of a service (managing and regulating the public telecommunications network) that confers special benefits on the payees. *See National Cable*, 415 U.S. at 340. *Cf. Rural Tele. Coalition v. FCC*, 838 F.2d 1307, 1314 (D.C. Cir. 1988) (upholding universal service contributions as a fee supporting allocations between interstate and intrastate jurisdictions).

[53] The Supreme Court has squarely held that Origination Clause challenges are subject to judicial review and do not fall under the political question doctrine.  "A law passed in violation of the Origination Clause would thus be no more immune from judicial scrutiny because it was passed by both Houses and signed by the President than would a law passed in violation of the First Amendment." *Munoz-Flores*, 495 U.S. at 397.

cause "a statute that creates a particular governmental program and that raises revenue to support that program . . . is not a 'Bil[l] for raising Revenue' within the meaning of the Origination Clause." *Id.*

Celpage points out that the Congressional Budget Office has treated universal service fund contributions as federal revenues. But how the government classifies a program for accounting purposes does not resolve whether the funds are used for a specific program or for general revenues. Indeed, the Court in *Munoz-Flores* upheld the special assessment even though the excess money collected was deposited in the Treasury. Instead of looking at accounting designations, *Munoz-Flores* teaches us (1) to determine whether the funds are "part of a particular program to provide money for that program . . . ." and (2) to establish a connection between the payors and the beneficiaries. *Munoz-Flores*, 495 U.S. at 399, 400 n.7.

With one exception,[54] universal service contributions are part of a particular program supporting the expansion of, and increased access to, the public institutional telecommunications network. *See* Order ¶ 8. Each paging carrier directly benefits from a larger and larger network and, with that in mind, Congress designed the universal service scheme to exact payments from those companies

---

[54] *See* discussion of § 254(h) support for internet services, *infra* part III.B.1. Unlike the circumstance in that case, the situation here is that of a telecommunications service provider's (a paging carrier's) being required to support the maintenance of a large telecommunications network.

benefiting from the provision of universal service.[55]  This design

prevents the sums being used to support the universal service

program from being classified as "revenue" within the meaning of

the Origination Clause.

Paging carriers are uniquely dependent on a widespread tele-

communications network for the maintenance and expansion of their

business.  *See* Order ¶ 82.  As in *Munoz-Flores*, the challenged

assessment targets a group "to which some part of the expenses" of

sustaining the universal service program "can fairly be

attributed."  *See Munoz-Flores*, 495 U.S. at 400 n.7.  Therefore,

the application of the universal service contribution requirement

to paging carriers does not transform the Act into a "bill for

raising revenue" in violation of the Origination Clause.[56]


(b).  EQUAL PROTECTION.

To invalidate the FCC's actions on equal protection grounds,

---

[55] *See* § 254(d) ("Every telecommunications carrier that provides interstate telecommunications services shall contribute . . . to the . . . mechanisms established by the Commission to preserve and advance universal service."); § 254(f) ("Every telecommunications carrier that provides intrastate telecommunications services shall contribute . . . .").

[56] The *Munoz-Flores* Court does not discuss in great detail the importance, in Origination Clause analysis, of some kind of relationship between the payors and the beneficiaries.  Still, it makes sense that the Court would insist on some link, because an assessment on one group for the benefit of a completely unrelated group is how courts have distinguished taxes raised for general federal outlays from fees raised for specific programs.  Otherwise, Congress could *always* avoid the Origination Clause requirement because, in theory, all revenue is raised to fund some "particular program."  Thus, courts must establish *some* relationship between the payors and the beneficiaries to avoid the strictures of the Origination Clause.

we must find that there is no "basis for the action that bears a debatably rational relationship to a conceivable legitimate governmental end."  *See Reid v. Rolling Fork Pub. Util. Dist.*, 979 F.2d 1084, 1087 (5th Cir. 1992).  This is a tough burden, and Celpage does not come close.  Celpage argues there can be no rational reason to include paging carriers in the universal service contribution system, because its contributions will support services that do not benefit Celpage.  But the FCC has offered a reasonable proposition:  Paging carriers such as Celpage benefit from a larger and more universal public network system, because it increases the number of potential locations for paging use.  Even if this proposition is wrong, as Celpage suggests, it certainly meets the very low "debatably rational" test.[57]

### (c).  TAKING.

Celpage advances an unconvincing takings claim.  As an initial matter, a takings claim is not ripe until a claimant has unsuccessfully sought compensation from the state.[58] Celpage does not allege that it has used any of the FCC's administrative procedures to petition for compensation or that such procedures are

---

[57] *See Reid*, 979 F.2d at 1087 (5th Cir. 1992) (stating that a "decision of a governmental body does not violate equal protection guarantees if there is any basis for the action that bears a debatably rational relationship to a conceivable legitimate governmental end").

[58] *See Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 193 (1985).

so inadequate as to make resort to these procedures futile. "To violate the [takings] clause, the state must not only take someone's property but also deny him compensation." *Samaad v. City of Dallas,* 940 F.2d 925, 934 (5th Cir. 1991).

As we did in the case of GTE's challenge to the forward-looking cost methodology, we reject Celpage's takings claim as not ripe for judicial review.[59]

### ii. OTHER CHALLENGES.

Celpage attacks the FCC's interpretation of the "equitable and nondiscriminatory" language in § 254(b)(4). To be truly equitable, Celpage asserts, the agency should not treat all carriers in the same way for purposes of the universal service contribution system. Additionally, Celpage accuses the agency of failing to consider evidence of congressional intent, the record evidence, and other evidence of why paging carriers should not be included in the universal service contribution system.

The FCC has successfully dispensed with the plain language challenge. First, as we have explained, the "equitable and non-discriminatory" language in § 254(b) acts as only one of seven

---

[59] Even if we considered Celpage's takings claim, it would fail to demonstrate how its claim comports with the three factors the Supreme Court has established to analyze a regulatory takings claim: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. *See Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225 (1986). In particular, Celpage has failed to offer reasonably specific predictions of the size and scale of this taking, thereby failing to show the extent to which the regulation has interfered with its distinct investment-backed expectations.

guiding principles for FCC rulemaking. *See supra* part III.A.1.a.i.

That subsection also instructs the agency that "*all providers* of

telecommunications services should make an equitable and

nondiscriminatory contribution" to universal service. (Emphasis

added.) The language of § 254(b) directs us to give the FCC, in

addition to the usual *Chevron* deference, discretion here to fashion

a policy that is guided by both of these principles.

Celpage also challenges the FCC's interpretation as arbitrary

and capricious under the APA because it is not supported by the

record, and the agency has provided no reason why its decision

should be made in the face of contrary record evidence.

Specifically, Celpage says that the FCC failed to consider *ex parte*

statements by legislators during the rulemaking proceedings urging

it to exclude CMRS carriers from the universal service contribution

system. Additionally, Celpage points to evidence in the record

supporting its position and claims the FCC failed to consider it.

To achieve reversal under the APA's arbitrary and capricious

standard, Celpage must show that the FCC failed to "articulate[] a

rational relationship between the facts found and the choice made

. . . ." *Harris*, 19 F.3d at 1096. A reviewing court tries "to

determine whether the decision was based on a consideration of

relevant factors . . . ." *Louisiana v. Verity*, 853 F.2d 322, 327

(5th Cir. 1988).

The record does not show that the FCC failed to consider the

59

counter-arguments proffered by the CMRS providers and their allies. The agency did take note of letters from Congress on behalf of CMRS providers and from other legislators taking the opposite position. *See* Report to Congress ¶ 129 & n.301.  Moreover, the letters on both sides have limited persuasiveness, because they are simply "post-passage remarks" that "'represent only the personal views of these legislators'" and "cannot serve to the change the legislative intent of Congress expressed before the Act's passage." *Regional Reorganization Act Cases*, 419 U.S. 102, 132 (1974) (quoting *National Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 639 n.34 (1967)).

The FCC offered a reasonable justification for including CMRS providersŞŞthis time relying on statutory language, the Joint Board recommendation, and the reasonable view that paging carriers do receive benefits from the universal service system.  Accordingly, the agency's interpretation may not fairly be described as "arbitrary and capricious" under the APA.[60]

### iii.   IMPLEMENTING UNIVERSAL SERVICE ASSESSMENT REQUIREMENTS.

Celpage and the CMRS Providers challenge the FCC's rules and

---

[60] Celpage also challenges the FCC's ruling for violating its own principle of "competitive neutrality."  Because this term has been developed by the FCC through regulation rather than through interpretation of the statute, we should give the agency broad deference in applying this principle, and we can reverse only if we find the FCC's actions "arbitrary, capricious or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844.  The FCC's decision to require paging operators to contribute to the support of a network through which their business operates is not so irrational or arbitrary as to merit reversal.

procedures for assessing contributions in the form of the Universal Service Worksheet. Specifically, Celpage attacks the worksheet for failing to distinguish between billed revenues and collected revenues for purposes of calculating universal service contributions. The CMRS Providers complain that the FCC's failure to provide guidance on how to adjust for the different nature of CMRS revenues makes the assessment system unconstitutionally vague.

We do not reach the vagueness argument, because the FCC persuasively responds that these challenges are not yet ripe for judicial review, for the reason that the agency has made a "tentative decision." [61] Similar attacks on the Worksheet are currently pending before the agency as petitions for reconsideration.[62] Moreover, recognizing the difficulties that the Worksheet raises, the FCC has already granted CMRS providers interim relief by allowing them to provide good-faith estimates of the figures required by the Worksheet.

Thus, the agency properly asks us to defer judicial review of its tentative decision until all administrative remedies are ex-

---

[61] *See Pub. Citizen Health Research v. Commissioner, Food & Drug Admin.*, 740 F.2d 21 (D.C. Cir. 1984) (refusing to exercise judicial review over tentative agency actions absent excessive delay or extraordinary recalcitrance).

[62] On October 26, 1998, the FCC released an order and a further notice of proposed rulemaking on the question of how to assess wireless carriers' revenues. The agency made a tentative decision to provide wireless carriers with interim guidelines for how to approximate their percentage of interstate wireless revenues. Additionally, the agency sought comment on various proposals for a final guideline on such calculations and comment on the relationship of wireless communications providers to universal service. This order further supports the FCC's position that it has not yet made a final decision on how to handle these issues.

hausted.  In analogous situations, courts have postponed review "until relevant agency proceedings have been concluded [to] permit[] an administrative agency to develop a factual record, to apply its expertise to the record, and to avoid piecemeal appeals." *See Telecommunications Research & Action Ctr. v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984) (internal citations omitted).

iv.  STATES' COLLECTION OF UNIVERSAL SERVICE ASSESSMENT FROM CMRS CARRIERS.

Celpage and the CMRS Providers make a convincing challenge in contesting the FCC's decision to permit states to impose universal service contribution requirements on CMRS providers.  They argue that the plain language of 47 U.S.C. § 332(c)(3)(A) specifically preempts states from doing so.  Additionally, the CMRS Providers contend that § 254(f)'s language, relied on by the FCC, does not reach CMRS providers, because they are interstate carriers.

(a)  Plain Language of § 332(c)(3)(A).

Celpage and the CMRS Providers argue that in § 332(c)(3)(A), "Congress has spoken to the precise question at issue," the ability of states to assess CMRS providers for universal service contributions.  *See Chevron*, 467 U.S. at 842.  Therefore, they argue that the FCC's interpretation deserves no deference.  The plain language of § 332(c)(3)(A) does seem to apply to the issue at

hand:

> Notwithstanding sections 152(b) and 221(b) of this title, no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services. Nothing in this subparagraph shall exempt providers of commercial mobile services (where such services are a substitute for land line telephone exchange service for a substantial portion of the communications within such State) from requirements imposed by a State commission on all providers of telecommunications services necessary to ensure the universal availability of telecommunications service at affordable rates.

Before we discuss the differing interpretations of the statute, we must decide on the proper standard of review. The Tenth Circuit recently reviewed the FCC's interpretation of this section under the second step of *Chevron,* because the statute does not expressly state how we should read § 332(c)(3)(A) in relation to § 254(f). *See Sprint*, 149 F.3d at 1061. This standard of review is inappropriate, however, because it would allow the FCC to receive *Chevron* deference in almost every situation in which two sections of a statute must be read together. Indeed, the Act does contain a specific rule of statutory construction in § 601(c)(1), *reprinted in* 47 U.S.C. § 152 (Addendum A-1): "This Act and the amendments made by this Act shall not be construed to modify, impair or supersede Federal, State or local law unless expressly provided in such Act or Amendments."

Thus, we disagree with the *Sprint* court that the lack of a

specific provision discussing the relation between §§ 332(c)(3)(A) and 254(f) automatically triggers *Chevron* deference. To the contrary, § 601(c)(1) gives us explicit instruction to read § 254(f) ("federal law") as not conflicting with § 332(c)(3)(A). Therefore, we conduct a *Chevron* step-one review and try to search out the statute's plain meaning.

Celpage and the CMRS Providers offer this "plain common sense" reading: Assessments for universal service by state commissions constitute regulation of rates or entry for purposes of the statute. The first sentence of this subsection prohibits the states from regulating rates or entry, and therefore prohibits universal service assessments, relating to CMRS providers. The second sentence explains that states may impose universal service requirements "where such services are a substitute for land line telephone exchange service . . . ." This plain language, Celpage and the CMRS Providers argue, expressly prohibits states from requiring universal service contributions from CMRS providers without first making a finding that the CMRS services in question are a substitute for landline telephone service.

The FCC points to plain language that requires it to make "[e]very . . . carrier that provides intrastate telecommunications service" contribute to the universal service programs as determined by the states. *See* 47 U.S.C. § 254(f). It then contends that the provisions of § 332(c)(3)(A) should not be read to trump the

express commands of § 254(f).

The FCC finds support for its reading in the second clause of the first sentence of § 332(c)(3)(A). First, it concludes that requiring universal service contributions is neither rate nor entry regulation. *See Fourth Reconsideration Order* ¶ 301. It then notes that this clause says that a state is not prohibited from regulating "other terms and conditions of commercial mobile services." Based on this clause alone, the FCC argues, the states retain the ability to compel universal service contributions as long as it does not constitute regulation of rates or entry. The second sentence simply clarifies that states can also regulate "rates and entry" if they make a finding that CMRS providers are substituting for landline service.

The *Sprint* court adopted this reading of § 332(c)(3)(A) and added another argument for the FCC's position. *See Sprint*, 149 F.3d at 1061. The second sentence's introductory language, "nothing in this subparagraph . . .," limits the reach of the landline substitution requirement to § 332(c)(3)(A). Therefore, the landline substitution requirement "simply is not relevant to § 254(f)." *Id.*

The petitioners argue that the FCC's reading violates the maxim of statutory construction that all language of a statute must

be given effect.[63]  According to the petitioners, if we read the clause "other terms and conditions" to enable states to impose universal service requirements, then the entire second sentence would be redundant.  There would be no reason to create a statutory requirement for when states may impose conditions for universal service if the "other terms and conditions" clause already allows states to impose universal service requirements on CMRS providers.

But the FCC persuasively responds that, under its reading, the second sentence clarifies the ability of states to regulate rates and entry in the name of universal service, while the "other terms and conditions" clause opens the door to all other universal service regulation.  Thus, we do not conclude, as the petitioners imply we should, that requiring universal service contributions necessarily constitutes the regulation of rates and entry.[64]  Thus, under the FCC's reading, the states may generally regulate CMRS providers as they please, but they may regulate the rates and entry of CMRS providers only when they make a finding of substitutability.

We disagree with the CMRS Providers' further argument that

---

[63] *See Mississippi Poultry Ass'n v. Madigan*, 31 F.3d 293, 304 (5th Cir. 1994) (en banc) ("[A] statute should be interpreted so as not to render one part inoperative.").

[64] A state commission could require a universal service contribution based on end-user revenues but leave the carrier free to set its rates as it pleases while not blocking new carriers from entering the market.  On the other hand, a state commission would be regulating "rates and entry" if it required the carriers to lower rates for one group of customers as part of an implicit subsidy.

even this reading, adopted in *Cellular Telecomms. Indus. Ass'n v. FCC*, 168 F.3d 1332 (D.C. Cir. 1999),[65] would render the second sentence redundant because the third sentence of the subsection specifically lays out the procedures under which a state can petition for the right to regulate CMRS rates. The FCC's reading would still permit the following understanding of the statute: States (1) in general can never regulate rates and entry requirements for CMRS providers; (2) are free to regulate all other terms and conditions of CMRS service; (3) may regulate CMRS rates and entry requirements when they have made a substitutability finding in connection with universal service programs; and (4) may also regulate CMRS rates if they petition the FCC and meet certain statutory requirements, including either substitutability or unjust market rates. None of the provisions would have to be read as inoperative or redundant.

Additionally, this reading would avoid conflict with § 254(f), which requires that "every telecommunications carrier" contribute to the universal service fund. This rendition of § 332(c)(3)(A) allows the FCC to give effect to the plain language of § 254(f) while not violating § 601(c)'s directive to construe the Act in ways that do not "modify, impair, or supersede" federal law.

Therefore, the reading offered by Celpage and the CMRS Providers does not represent the unambiguous intent of Congress. The

---

[65] *See also Sprint Spectrum, L.P. v. State Corp. Comm'n*, 966 F. Supp. 1043 (D. Kan. 1997).

FCC's reading reflects Congress's unambiguous intent as expressed in the plain language of the statute and takes into account Congress's instruction that § 254 be construed in ways that do not conflict with other federal laws.[66]  Therefore, we reject Celpage and the CMRS providers' challenges to this section of the Order.

### (b)  CMRS PROVIDERS AS INTERSTATE CARRIERS.

Celpage and the CMRS Providers raise a weak challenge to state contribution requirements, contending that CMRS providers are "jurisdictionally interstate" and therefore exempt from state assessments.  We agree with the FCC that the plain language of § 254(f) simply requires that "[e]very telecommunications carrier that provides intrastate telecommunications services" contribute to state mechanisms.  As the agency found, a significant portion of the CMRS providers' services arise from providing *intrastate* tele-communications services.[67]  This undeniably significant involvement of CMRS providers in the provision of intrastate service is more than sufficient to place them within the ambit of § 254(f).

---

[66] Even if the CMRS providers are right that the plain language does not unambiguously support the FCC's reading, we would defer to the FCC's reasonable interpretation under *Chevron* step-two.  *Accord Cellular Telecommunications*, 168 F.3d at 1336 ("The bottom line is that Cellular has not demonstrated that its interpretation of § 332(c)(3)(A) is the only permissible one . . . .").

[67] According to one study, interstate revenues accounted for only 5.6% of total revenues for cellular and personal communications service carriers and 24% of total revenues for paging and other mobile service carriers.  *See* Fourth Reconsideration Order ¶ 303.

### b. Determining That Interstate Carriers Must Contribute on the Basis of Their International Revenues.

COMSAT, a small interstate carrier specializing in providing international telephone service, challenges the FCC's decision to define the universal service base to include the international revenues of interstate carriers. COMSAT derives such a small portion of its revenues from interstate service that it would end up with universal payment obligations exceeding its interstate revenues. It argues that this bizarre outcome violates § 254(d)'s requirement that all universal service contributions be "equitable and nondiscriminatory" and the FCC's own principle of competitive neutrality. At the very least, COMSAT argues, this result shows that the FCC's action is arbitrary and capricious.

As a threshold matter, the FCC challenges the availability of judicial review, because COMSAT failed to petition the agency for reconsideration, as required by § 405 of the Act.[68] COMSAT responds that the absence of a § 405 petition for rehearing is not a bar to judicial review if the petitioner was a party in the rulemaking proceeding and the FCC was afforded an opportunity to rule on the issue.[69] Because COMSAT did participate in the rulemaking pro-

---

[68] 47 U.S.C. § 405(a).

[69] "The filing of a petition for reconsideration shall not be a condition precedent to judicial review of any such order, decision, report, or action, except where the party seeking such review (1) was not a party to the proceedings resulting in such order, decision, report, or action, or (2) relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass." 47 U.S.C. § 405(a).

ceeding and did file comments[70] with the agency on this question, we agree that § 405 does not bar our review.[71]

The FCC is more persuasive when it argues that COMSAT is really asking for consideration of its individual circumstance rather than challenging the rule as a whole. In this situation, the FCC argues that waiver is a more appropriate remedy than is judicial review. In fact, COMSAT did file a petition for waiver but withdrew it without explanation shortly before the FCC filed its brief in this case. COMSAT now claims to be bringing this claim on behalf of all international carriers in similar circumstances, but it fails to identify any such entities and remains alone in its petition for review.

While waiver may be an appropriate remedy, the FCC cites no authority for the proposition that consideration of a waiver is required before judicial review may occur, and our research has found no such authority. The case relied on by the FCC stands only for the proposition that waiver will be allowed as long as the underlying rule is rational.[72] We see no statutory basis for denying judicial review on the ground that a party must first seek

---

[70] *See generally Comments of COMSAT Corp.*, CC Docket No. 96-45 (filed Dec. 19, 1996); *Comments of COMSAT Corp.*, CC Docket No. 96-45 (filed April 12, 1996).

[71] *See Time Warner Entertainment Co., L.P. v. FCC*, 144 F.3d 75, 80 (D.C. Cir. 1998) ("So long as the issue is necessarily implicated by the argument made to the Commission, section 405 does not bar our review.").

[72] *See National Rural Telecomm. Ass'n v. FCC*, 988 F.2d 174, 181 (D.C. Cir. 1993).

a waiver. Therefore, we consider the rule on its merits.

COMSAT's attack boils down to the argument that it is being unfairly treated because it will be forced to pay more in universal service contributions than it can generate in interstate revenues.[73] It makes a compelling argument that this result alone violates the equitable language of the statute. The FCC's response to the statutory challenge simply states that there is nothing "inequitable" about requiring a carrier benefiting from universal service from contributing to it.

Under this reading, however, it is difficult to know what the FCC would consider inequitable, because any carrier could conceivably benefit from universal service. Obviously, the language also refers to the fairness in the allocation of contribution duties. In this matter, COMSAT can show that it is being forced to pay more under this rule than it can generate in revenues, yet the FCC does not find even this situation "inequitable."

Moreover, the FCC dismisses COMSAT's claim that the agency violates the "nondiscriminatory" requirement of § 254(d) simply by saying that the agency has recognized that some providers of international service will be treated differently from others. But this recognition of discrimination hardly saves the agency from the

---

[73] COMSAT estimates that the application of the FCC's interpretation would require it to contribute more in universal service fees ($5 million) than it would generate in interstate revenues ($3.8 million).

statutory requirement that contributions are collected on a non-discriminatory basis.

The agency falls back on its discretion, under the statute, to balance the competing concerns set forth in § 254(b), which include the need for sufficient revenues to support universal service. While the statute allows the FCC a considerable amount of discretion, however, that discretion is not absolute. The heavy inequity the rule places on COMSAT and similarly situated carriers cannot simply be dismissed by the agency as a consequence of its administrative discretion.

Therefore, the agency's interpretation of "equitable and non-discriminatory," allowing it to impose prohibitive costs on carriers such as COMSAT, is "arbitrary and capricious and manifestly contrary to the statute." *Chevron*, 467 U.S. at 844. COMSAT and carriers like it will contribute more in universal service payments than they will generate from interstate service.[74] Additionally, the FCC's interpretation is "discriminatory," because the agency concedes that its rule damages some international carriers like COMSAT more than it harms others. The agency has offered no reasonable explanation of how this outcome, which will require companies such as COMSAT to incur a loss to participate in interstate service, satisfies the statute's "equitable and nondiscriminatory"

---

[74] COMSAT also points out that much of the interstate service it provides is at the request of the government, to ensure service to isolated locations such as Guam and American Samoa.

language.  We therefore reverse and remand this portion of the Order for further consideration.


6.  TIMING.

a.  TIMETABLE FOR THE IMPLEMENTATION OF
AN EXPLICIT SYSTEM OF UNIVERSAL SERVICE SUPPORT.

On statutory and constitutional grounds, GTE attacks the FCC's timetable for implementation of an explicit system of universal service support.[75]  First, GTE argues that the agency's decision to wait until January 1, 2000, before implementing its plan for providing explicit support for universal service violates the statu-

---

[75] The FCC asks us to bar review of this question, arguing that GTE and SBC are collaterally estopped from litigating it because they did so during challenges to the Access Charge Order in the Eighth Circuit.  *See Southwestern Bell*, 153 F.3d at 537.  Before applying collateral estoppel, we must first decide whether (1) the issue under consideration is identical to that litigated in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case; and (4) there is no special circumstance that would make it unfair to apply the doctrine.  *See Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 391 (5th Cir. 1998), *cert. denied*, 119 S. Ct. 1286 (1999).

We agree with the petitioners that the challenge to the FCC's high-cost support timetable is not "identical," for collateral estoppel purposes, to the issue raised in that case.  Although the petitioners challenge the coordination between implicit subsidies in the access charge system and those in the new support system, their challenge in this case involves a broader attack on the timing of the entire universal service high-cost support system rather than on just its interactions with the access charge system.

The Eighth Circuit did not consider the contention that GTE brings before us: that the FCC violated § 254(a) by failing to implement an "explicit" and "sufficient" universal service support system within "fifteen months" of the 1996 Act's enactment.  The Eighth Circuit relied on the fact that the deadline for adopting rules on universal service came after the date for adopting rules on opening the market to local competition.  *See Southwestern Bell*, 153 F.3d at 537.  Therefore, there was no need for that court to decide whether § 254(a) requires full implementation within "fifteen months" of the enactment, and GTE is not collaterally estopped for pursuing its appeal of § 254(a) in this court.  *See Winters*, 149 F.3d at 391 n.3 ("[U]nless prior issue sought to be precluded from relitigation was a 'critical or necessary part' integral to the prior judgment, collateral estoppel may not apply.").

73

tory requirements of § 254.  Second, GTE asserts that the delay in implementation results in an unconstitutional taking.

### i.  STATUTORY LANGUAGE.

GTE contends that the delay in implementation violates § 254(e) because it fails to provide "sufficient" funding to support universal service.[76]  In fact, between the Order's release on May 8, 1997, and its implementation on January 1, 2000, the FCC will have provided no explicit support to the ILEC's, while it has already exposed them to outside competition.  In theory, then, new entrants could begin "cherry-picking" the ILEC's' best low-cost, high-profit customers, leaving the ILEC's stuck with the high-cost, money-losing customers that are supposed to be supported by the new universal service subsidy system.  This would erode the old implicit subsidy system before the FCC had implemented the new explicit subsidy system.

The question is whether the statute's language plainly requires the FCC to have implemented explicit subsidies at the same time that it issued the Order on May 8, 1997.  GTE claims the statute requires immediate implementation.  But the plain language of § 254(a)(2) requires us to reach the opposite result:

The Commission shall initiate a single proceeding to im-

---

[76] GTE also claims that the FCC's actions violate the "predictable" and "nondiscriminatory" requirements of § 254(b).  We see no merit to this contention and focus instead on GTE's best statutory argument, which relies on the use of the term "sufficient" in § 254(e).

plement the recommendations from the Joint Board required by paragraph (1) and shall complete such proceeding within 15 months after February 8, 1996. The rules established by such proceeding shall include a definition of the services that are supported by Federal universal service support mechanisms and *a specific timetable for implementation.*

47 U.S.C. § 254(a)(2)(emphasis added).

By instructing the FCC to establish a "*timetable* for implementation" by the statutory deadline, Congress assumed the implementation process would occur over a transition period after the fifteen-month deadline. There is no reason to believeSSand GTE does not offer a reasonSSthat the instruction to establish a timetable actually means immediate implementation of the explicit subsidy system at the statutory deadline.[77]

Not surprisingly, GTE falls back on the term "sufficient" and argues that even if the FCC may slowly implement the high-cost support program, the statute still requires the agency to ensure that support is sufficient during the transition period. For reasons that we have outlined, the FCC should be accorded a substantial amount of deference when interpreting this word. *See supra* part III.A.a.i.

GTE essentially asks us to hold that "sufficient" is violated whenever there is a change (or the possibility of a change) from

---

[77] Section 254(e) contemplates that universal support will be "explicit" and "sufficient" "[a]fter the date on which Commission regulations implementing this section [§ 254(e)] take effect." This language further supports the FCC's reading that Congress did not require implementation of the high-cost support program immediately after the 15-month deadline.

75

the current levels of universal service support. The plain meaning of "sufficient" is far from unambiguous as it pertains to the timing of the high-cost support program's implementation. Calculating how much support is sufficient to provide support for universal service is a judgment the FCC is better able to make than are we, and we therefore defer to its reasonable interpretation under *Chevron* step-two.

As the agency explains, the amount of competition in local markets depends on a number of different factors, of which the implementation of the universal service plan is only one. To enter a new market, entrants must invoke rights to interconnection agreements under §§ 251 and 252.[78] In almost all cases, these agreements require lengthy arbitrations by state commissions. Even after the completion of such arbitrations, there may be many court challenges. Because only competition in local markets can erode the current implicit subsidy system to an insufficient level, the FCC made a reasonable determination that there was little chance of such competition's emerging in the near future.

Where the statutory language does not explicitly command otherwise, we defer to the agency's reasonable judgment about what will constitute "sufficient" support during the transition period

---

[78] The Supreme Court did not issue its final word on these sections until January 25, 1999. *See Iowa Utilities*, 119 S. Ct. 721. In the meantime, many potential entrants were stymied in the arbitration process and by the uncertainty over the FCC's jurisdiction to implement its local competition order. Therefore, it is not surprising that the agency did not expect an onslaught of local competition during the interim period.

from one universal service system to another. We follow the Eighth Circuit's recent holding on a similar issue: "The Commission has made a predictive judgment, based on evidence in the record and adequately explained in the order, that competitive pressures in the local exchange market will not threaten universal service during the interim period until the permanent, explicit universal service support mechanisms have been fully implemented." *Southwestern Bell*, 153 F.3d at 537.

ii. TAKING.

In some ways, GTE's takings argument is simply another version of its contention regarding lack of "sufficient" support. On both issues, GTE argues that the FCC's decision to leave ILEC's exposed to local competition without first implementing the new universal service plan results in a severe reduction of its revenues from local service. Relying on *Brooks-Scanlon v. Railroad Comm'n*, 251 U.S. 396 (1920), GTE argues that a regulated entity cannot be forced to operate one segment of its business at a loss on the expectation that it can make up the shortfalls from another competitive line of business. At the very least, GTE says, the FCC should adopt a narrow construction of the statutory language to avoid any constitutional infirmities.[79]

The FCC responds that before a narrowing construction should

---

[79] *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council,* 485 U.S. 568, 575 (1988).

77

be considered, GTE must show that a taking will "necessarily" result from the regulatory actions. *See United States v. Riverside Bayview Homes*, 474 U.S. 121, 128 n.5 (1985). Even if GTE can show that some taking will result, it must demonstrate that its losses are so significant that the "net effect" is confiscatory. *See Duquesne*, 488 U.S. at 310-16.

GTE has failed to meet the requirements of *Duquesne*, because it cannot show that it will lose any revenue at all, much less enough to constitute a taking under more recent precedent. Its attempt to distinguish *Duquesne* is misguided because, contrary to GTE's claim, the *Duquesne* Court did not base its finding of takings on the fact that the market was no longer closed to competition.

Rather, *Duquesne* stands for the proposition that "no single ratemaking methodology is mandated by the Constitution, which looks to the consequences a governmental authority produces rather than the techniques it employs." *Duquesne*, 488 U.S. at 299 (Scalia, J., concurring). *Duquesne* does not require courts to engage in a takings analysis whenever an agency opens a previously regulated market to competition. Further, as we explained in sustaining the forward-cost looking methodology, GTE's reliance on *Brooks-Scanlon* is misplaced, because we will not apply the rule in that case to transitional or temporary periods. *See Continental Airlines*, 784 F.2d at 1251.

## b. ACCESS CHARGES AT FORWARD-LOOKING COST LEVELS AS SOON AS COST MODELS ARE AVAILABLE.

MCI asks the FCC to reduce access chargesSSthe fees charged by ILEC's on interstate callsSSto the forward-looking cost level used by the agency to calculate support for high-cost areas. Under the FCC's plan, ILEC's will be required to reduce their access charges by the amount they receive in the form of explicit universal service subsidies. MCI argues that by permitting the ILEC's to retain the amount of access charge revenue above cost, the FCC has violated its statutory mandate to eliminate implicit subsidies when it implements the new universal service plan.

This argument differs from GTE's assertions. While GTE seeks immediate implementation of the explicit subsidy program, MCI seeks to include the elimination of implicit subsidies within the rubric of the explicit subsidy program. In fact, GTE's fear that implicit subsidies will be eroded during the transition period is precisely the goal of MCI's intervention. Because GTE does not seek the elimination of the implicit subsidies, it is making an argument different from MCI's.

For this reason, we agree with the FCC that MCI cannot properly intervene on this issue, because none of the petitioners raised the same challenges to the Order. In *United Gas Pipe Line*, 824 F.2d at 437, we held that "intervenors may not challenge aspects of the Commission's orders not raised in the petitions for review." Because MCI's challenge does not raise an issue brought

79

up by any of the petitioners, we do not consider its arguments on appeal, but follow the District of Columbia Circuit and decline to grant intervenor standing in a situation in which "we could grant [the intervenor] the full relief it seeks while rejecting all of the petitioners' challenges, and vice versa." *Illinois Bell Tel. Co. v. FCC*, 911 F.2d 776, 786 (D.C. Cir. 1990).[80]

### c. PLAN FOR TRANSITION TO A NEW UNIVERSAL SERVICE SYSTEM FOR RURAL, INSULAR, AND HIGH-COST AREAS.

The FCC's transition plan for its new explicit subsidy universal support system does not immediately apply to all ILEC's. All carriers eligible for universal service support will become part of the new system on January 1, 2000. Small rural carriers, however, will not be required to move into the new system until 2001 at the earliest. *See* Order ¶ 204. Specifically, the agency (1) has exempted rural carriers, defined as those carriers serving study areas of less than 100,000 lines, from the new forward-

---

[80] MCI claims that the FCC is trying to evade review of this question through procedural maneuvering. When BellSouth, in its Eighth Circuit challenge to the Access Charge Order, raised the issue of the FCC's failure to remove all implicit subsidies, the agency argued that this question should be addressed in this court in challenges to the Universal Service Order. Now that MCI has raised that same issue, MCI argues that the agency should not be allowed to dodge review again on procedural grounds.

Unfortunately for MCI, it was not any manipulation of procedural rules by the FCC that prevented MCI from properly raising this issue on appeal. There was no legal reason that prevented MCI from filing a brief as a petitioner rather than as an intervenor. Thus, the FCC's procedural moves are irrelevant for purposes of deciding whether MCI may properly intervene. The only question, then, is whether MCI's challenge to the Order for failing to reduce access charges immediately is the same as GTE's challenge to the Order for failing to implement explicit subsidies immediately. We see no such resemblance.

looking cost methodology until at least January 1, 2001,[81] and (2) has allowed carriers with 200,000 or fewer working loops per study area to continue recovering extra support from the high-cost fund until implementation of the new methodology on January 1, 2000. *See* Order § 210.

### i. ESTABLISHING A LONGER TRANSITION PERIOD FOR RURAL CARRIERS WITH FEWER THAN 100,000 LINES.

Vermont[82] attacks the small rural carrier exemption because it does not permit large carriers who happen to serve rural areas the same delayed transitional treatment that rural carriers with study areas of less than 100,000 lines will receive. Vermont argues that there is no statutory or reasonable basis for distinguishing among rural carriers simply because of their size. For example, census statistics show that Vermont has more residents living in rural areas than does any other state, yet its carrier, Bell Atlantic, does not qualify for the same treatment as do other rural carriers as defined by the FCC's 100,000-line distinctions.

Vermont does not point to any statutory authority for its claim that the FCC must give all rural carriers the same treatment under the plan. Instead, it simply argues there is no good reason to treat Bell Atlantic differently from other rural carriers. For

---

[81] *See* Order ¶ 273 (stating that "non-rural carriers" will come under the new forward-looking cost methodology).

[82] Kansas initially joined Vermont in this challenge but indicates, in its reply brief, that it now withdraws from this portion of the appeal.

these reasons, it asks us to reverse on arbitrary-and-capricious grounds under the APA.

A statute survives judicial scrutiny under the APA's "arbitrary and capricious" standard as long as the agency "articulates a rational relationship between the facts found and the choice made" and "so long as the agency gave at least minimal consideration to relevant facts contained in the record." *Harris,* 19 F.3d at 1096. The FCC provides at least two reasons that articulate such a "rational relationship."

First, because the agency delayed the transition for rural carriers on the ground that its cost models for small carriers were inadequate, it was reasonable to treat Bell Atlantic differently. After all, Bell Atlantic is a large ILEC for which the FCC does have cost models. Second, the FCC justifies its delay for small rural carriers because it has found that they will have greater difficulty adjusting to a new system. Again, such a finding would not apply to Bell Atlantic. These reasons suffice.

ii. CONTINUING APPLICATION OF EXISTING HIGH-COST RULES
UNTIL THE NEW UNIVERSAL SERVICE SYSTEM TAKES EFFECT.

Vermont[83] challenges the decision to maintain extra support for ILEC's with study areas of 200,000 or fewer loops until the new methodology is implemented on January 1, 2000. In other words, by

---

[83] Kansas initially joined Vermont in this challenge, but has indicated in its reply brief that it now withdraws from this portion of the appeal.

exempting carriers with 200,000 or fewer lines from the new high-cost support methodology, the FCC again decided to give extra support to smaller carriers, in this case defined as those carriers with study areas containing 200,000 or fewer loops. As it did in challenging the 100,000 line distinction, Vermont asserts that the distinction is arbitrary and capricious because the FCC ignores evidence that size is not a reliable predictor of cost.

The FCC again argues that the 200,000-line rule is transitional, interim relief. The agency has stated that the extra support provided by this rule will expire when the new forward-looking cost methodology goes into effect on January 1, 2000. It asks us to accord it the "substantial deference" it needs to develop transitional solutions to complex regulatory problems. *See MCI Telecomms. v. FCC*, 750 F.2d 135, 140 (D.C. Cir. 1984).

In contrast to the situation involving the rural carrier exemption, the FCC has set a specific date for the end of this transitional period: January 1, 2000. Accordingly, the agency's commitment to a specific date for termination of the support resulting from the 200,000-loop rule makes the rule sufficiently transitional to avoid judicial review. Therefore, for lack of ripeness, we will not review Vermont's challenge to the effects of the 200,000-loop distinction.[84]

---

[84] Vermont argues that the 200,000-loop distinction will become permanent through its incorporation into the "hold harmless" rule articulated in the *Seventh Report and Order.* As we have discussed, *supra*, we do not have jurisdiction

(continued...)

B.   SUBSIDIZATION OF SERVICES FOR
SCHOOLS, LIBRARIES, AND HEALTH CARE PROVIDERS.

Section 254(h) adds a new wrinkle to the concept of universal service by directing the FCC to provide support to elementary and secondary schools, libraries, and health care providers.  Thus, the agency has a new statutory mandate to subsidize support for certain beneficiaries, irrespective of whether they are high-cost consumers.  GTE raises objections to the agency's implementation of this broad statutory mandate,[85] and Cincinnati Bell and the states challenge the proposal to assess contributions to this new universal service fund.

1.   MANDATING SUPPORT FOR INTERNET ACCESS
AND INTERNAL CONNECTIONS TO SCHOOLS AND LIBRARIES.

While section 254(h) plainly authorizes the FCC to support discounted telecommunications services to schools and libraries, GTE finds no equivalent statutory authority to support discounted internet access and internal connections.  Therefore, GTE argues

---

(...continued)
to consider the merits of that new Order except in the way that it affects our review of the Order.  The "hold harmless" principle was introduced in the *Seventh Report and Order* and remains outside the scope of this proceeding.

[85] As a threshold matter, GTE challenges the timing of the proposal, because it would require support for schools, libraries, and health care providers before the new system for explicit subsidies has been implemented.  For the same reasons we have discussed, *see supra* part III.A.6.1., we extend the FCC greater discretion in deciding what will be "sufficient" during the transition period, especially when there is little reason to believe that the old subsidy system will break down during that period.

that the agency exceeded its statutory authority when it mandated support for discounted internet services and internal connections.

Although we agree with GTE that the statute and its legislative history do not support the FCC's interpretation, the language of the statute is ambiguous enough to require deference under *Chevron* step-two. Because, however, the FCC's decision to extend universal service support to internet access and internal connections raises grave doubts as to whether § 254(h) creates an unconstitutional tax, we construe the statute narrowly to avoid raising these constitutional problems.[86]

The FCC concedes that internet access and internal connections cannot be defined as "telecommunications services" for purposes of the section.[87] It argues, however, that the plain language of § 254(h)(1)(B) and (c)(3) authorizes it to require discounted internet access and internal connections to schools and libraries

---

[86] Judge Garza does not join our analysis of the constitutional issues raised by the FCC's decision to provide discounts on internet services for schools and libraries, set forth in note 97, *infra*. He would not address these issues, because the parties did not raise them on appeal. *See Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (refusing to consider a constitutional issue of first impression "where counsel has made no attempt to address the issue" and "where, as here, important questions of far-reaching significance are involved"). *But see United States Nat'l Bank v. Independent Ins. Agents of Am.*, 508 U.S. 439, 446 (1993) (approving lower court's consideration of legal claim not argued by either party as part of courts' "independent power to identify and apply the proper construction of governing law")(internal quotations omitted); *United States v. Moore*, 110 F.3d 99, 101 (D.C. Cir. 1997) (en banc) (Silberman, J., dissenting) (conceding that the "rigor and integrity of *Carducci* was severely impaired by the unanimous decision of the Supreme Court" in *Independent Insurance Agents*).

[87] The FCC has recognized that internet access or internal connection services are "information services" that cannot be equated with "telecommunications services." *See* Order ¶ 439 n.1145.

(but not to health care providers).

Subsection 254(h)(1)(B) requires all telecommunications providers to provide to elementary schools, secondary schools, and libraries, on request, discounted services "that are within the definition of universal service under subsection (c)(3) of this section."  Subsection (c)(3) authorizes the FCC to designate "additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h) of this section."  These "additional services" are "[i]n addition to services included in the definition of universal service under paragraph (1)," which defines universal service as an "evolving level of telecommunications services."

The FCC points out that there is no language restricting these "additional" services to telecommunications services. Furthermore, Congress used the limiting term "telecommunications services" in § 254(h)(1)(A) when discussing the provision of universal service support for rural health care providers.  The agency argues that "the varying uses of the terms 'telecommunications services' and 'services' in § 254(h)(1)(A) and (B) suggests that the terms were used consciously to signify different meanings."  Order ¶ 439. Therefore, the FCC concluded that the term "additional services" is not limited to telecommunications services.  It then decided that, based on the legislative history and its understanding of the purposes of the statute, it should require internet access and

internal connections[88] support for schools and libraries.

We first consider whether the FCC's interpretation conflicts with the plain language of § 254(h)(1)(B) and (c)(3). Although the best reading of the statute does not authorize the agency's actions, we find the statute sufficiently ambiguous to invoke step-two of *Chevron*.

The statute restricts the FCC's authority to interpret the phrase "additional services" in subsection (c)(3) to "the purposes of subsection (h) of this section." The use of the phrase "telecommunications services" in the title of § 254(h) indicates that the "purposes of subsection (h)" are to provide discounted support for *telecommunications services*.[89]

We find further support for this reading in the legislative history of § 254(h): "New subsection (h) of section 254 is intended to ensure that health care providers for rural areas, elementary and secondary school classrooms, and libraries have affordable access to modern *telecommunications* services . . . ."[90]

---

[88] Calling "internal connections" a good and not a service, GTE separately attacks the "internal connections" requirement. The FCC argues that courts have recognized internal connections as services, *see NARUC v. FCC*, 880 F.2d 422, 430 (D.C. Cir. 1989), and that the legislative history's emphasis on connections to "classrooms" makes such a requirement reasonable. Given that the maintenance and installation of regular telephone lines also is characterized as a "service," we reject GTE's attempt to distinguish "internal connections."

[89] *See United States v. Wallington*, 889 F.2d 573, 577 (5th Cir. 1989) (stating that the "section heading enacted by Congress in conjunction with statutory text [is considered] to 'come up with the statute's clear and total meaning.'" (citation omitted)).

[90] H.R. CONF. REP. 104-458, at 132 (1996) (emphasis added), *reprinted in* 1996
(continued...)

The House Conference Report also elaborates on the interaction between subsections (h)(1)(B) and (c)(3):

> New section (h)(1)(B) requires that any telecommunications carrier shall, upon a bona fide request, provide services for educational purposes included in the definition of universal service under new subsection (c)(3) for elementary and secondary schools and libraries at rates that are less than the amounts charged for similar services to other parties, and are necessary to ensure affordable access to and use of such *telecommunications services*.[91]

And while the legislative history of subsection (c)(3) supports giving the FCC discretion when designating services for schools and libraries, it nevertheless describes the subsection (c)(3) definition as "applicable only to public institutional *telecommunications* users."[92] This language provides more evidence that Congress intended that the FCC designate additional *telecommunications* services under subsection (c)(3) rather than any additional services that the agency deems desirable.

Indeed, the agency's broad reading of "additional services" would mean that the use of the word "services" in other parts of § 254(c) could be broadened to include non-telecommunications services. For instance, § 254(c)(2) authorizes the Joint Board to recommend modifications to the definition of "services." Under the

---

(...continued)
U.S.C.C.A.N. 144.

[91] H.R. CONF. REP. 104-458, at 133 (1996) (emphasis added), *reprinted in* 1996 U.S.C.C.A.N. 144.

[92] *Id.*

FCC's interpretation, the Joint Board (composed of state telecommunications regulators and members of the FCC) could be free to redefine "services" to include services unrelated to telecommunications. This result is an implausible reading of Congress's intent.[93]

This is not the end of the analysis, however, because some aspects of the statute's language and legislative history also support the FCC's reading. First, the plain language of § 254(c)(1) invites the FCC periodically to re-define "universal service" to "tak[e] into account advances in telecommunications and information technologies and services." Moreover, the "purposes of subsection (h)" language in subsection (c)(3) could include more than the "telecommunications services" referred to in § 254(h)'s section heading. After all, subsection (h)(2)(A), which is also one of the "purposes of subsection (h)," instructs the FCC to establish competitively neutral rules to "enhance . . . access to advanced telecommunications and information services . . . ."

Finally, some of the legislative history implies that Congress intended for subsection(h) to support internet access:

[T]he provisions of subsection (h) will help open new

---

[93] We also agree with GTE that the FCC is asserting unlimited authority to prescribe support for whatever it wishes. At oral argument, counsel for the FCC could not point out how its interpretation could be limited even to internet access services. For instance, the agency could not explain why satellite television services or even janitorial services would not fit within its understanding of "additional services." In contrast, the plain language of § 254 provides an easily recognizable limit on FCC authority by confining § 254(h) support to telecommunications services. The superiority of GTE's reading, however, does not necessarily make Congress's intent unambiguous.

worlds of knowledge, learning and education to all AmericansSSrich and poor, rural and urban. They are intended, for example, to provide the ability to browse library collections, review the collections of museums, or find new information on the treatment of an illness, to Americans everywhere via schools and libraries.[94]

The reference to "brows[ing] library collections" indicates that in drafting subsection (h), Congress envisioned some kind of support for internet access.

The best reading of the relevant statutory language nonetheless indicates that the FCC exceeded its authority by mandating discounts for internet access and internal connections. The statutory invitation in subsection (c)(1) to "re-define" universal service to include information services does not necessarily relate to the FCC's authority under subsection (c)(3).

Additionally, subsection (h)(2)(A) provides the agency only with authority to "establish competitively neutral rules to enhance access" to information services. It does not contain specific language supporting provision of such services "at rates less than the amounts charged for similar services to other parties," as in subsection (h)(1)(B). And finally, the legislative history does not indicate whether Congress thought the statute would enhance access to internet services through discounts on telecommunications services or, instead, through direct subsidies for internet access.

---

[94] H.R. CONF. REP. 104-458, at 132 (1996), *reprinted in* 1996 U.S.C.C.A.N. 144.

90

Even though GTE has offered a persuasive reading of the statute, its plain language does not make Congress's intent sufficiently "unambiguous" for *Chevron* step-one review. Therefore, we defer to the FCC's interpretation under *Chevron* step-two and affirm those aspects of the Order providing internet services and internal connections to schools and libraries.[95]

## 2. AUTHORITY TO PROVIDE SUPPORT PAYMENTS TO NON-TELECOMMUNICATIONS ENTITIES THAT PROVIDE INTERNET ACCESS AND INTERNAL CONNECTIONS TO SCHOOLS AND LIBRARIES.

The FCC invokes its rulemaking power under § 254(h)(2)(A) and

---

[95] Before we defer to the FCC's interpretation of an ambiguously worded statute under the deferential *Chevron* step-two standard of review, we consider whether the agency's approach raises constitutional problems that should lead us to construe the statute in the manner urged by GTE. "[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *Jones v. United States*, 119 S. Ct. 1215, 1222 (1999) (internal citations omitted). This rule "has for so long been applied by this Court that it is beyond debate." *DeBartolo,* 485 U.S. at 574-75. It is also of such importance that a court will reject an agency interpretation of a statute that would ordinarily receive deference under *Chevron* step-two if it believes the agency's reading raises serious constitutional doubts. *Id.* (construing statute narrowly to avoid First Amendment problem).

We have identified two ways in which the agency's interpretation could raise constitutional concerns that might lead us to construe the statute more narrowly. First, the FCC's application of the universal service fund for non-telecommunications services could constitute an improperly delegated tax. Second, its interpretation of the reach of § 254(h)(1)(B) could have transformed the Act into a "bil[l] for raising revenue" in violation of the Origination Clause.

Though it is a close question, we conclude that the FCC's interpretation does not raise sufficiently serious constitutional doubts to override our normal *Chevron* step-two deference. While the relationship between internet services and the public telecommunications network is more attenuated than is that of paging services, *see supra* part III.A.5.a, we are not convinced that even this attenuated relationship raises serious doubts under *Munoz-Flores*. For similar reasons, this attenuated relationship does not raise serious doubts as to whether the FCC's interpretation makes the assessment an improperly delegated tax. *See Rural Tel. Coalition v. FCC*, 838 F.2d 1307, 1314 (D.C. Cir. 1988) (rejecting unconstitutional tax challenge to universal service support allocation finding).

its "necessary and proper" authority under § 154(i) to provide support payments to non-telecommunications entities that provide internet access and internal connections to schools and libraries. GTE attacks this decision as violating the express intent of Congress as read through the plain language of the statute.

The FCC does not argue that any specific provision of the statute authorizes it to add non-telecommunications companies to the universal service payment system. Rather, it avers that (1) the statute gives it broad authority to establish competitively neutral rules; (2) the statute does not speak directly to the issue of non-telecommunications providers; and (3) the statute's silence indicates that the agency should receive *Chevron* deference.

GTE relies on the traditional maxim of statutory construction, "*expressio unius est exclusio alterius.*"[96] GTE points out that § 254(h)(1)(B) already discusses how carriers will be reimbursed for providing discounted services: "[a] telecommunications carrier providing service under this paragraph . . . ." According to GTE, Congress's choice of the phrase "telecommunications carrier" precludes the FCC from providing those same payments to non-telecommunications carriers.

We conclude that the combination of the FCC's "necessary and proper" authority under § 154(i) and the limited usefulness of the

---

[96] "The expression of one thing implies the exclusion of another." "Hence, a statute that mandates a thing to be done in a given manner . . . normally implies that it shall not be done in any other manner . . . ." 73 AM. JUR. 2D *Statutes* § 211 (1995).

92

*expressio unius* doctrine in the administrative context permit the FCC to expand the reach of universal support to non-telecommunications carriers. While courts have rightly warned against using silence in a statute to give "agencies virtually limitless hegemony,"[97] we are convinced that Congress intended to allow the FCC broad authority to implement this section of the Act.

In *Iowa Utilities Board*, the Eighth Circuit offered this explanation of the reach of § 154(i) in denying the FCC jurisdiction over the pricing of local telephone service: "[Section 154(i)] merely suppl[ies] the FCC with ancillary authority to issue regulations that may be necessary to fulfill its primary directives contained elsewhere in the statute. [It does not] confer[] additional substantive authority." 120 F.3d at 795. In this matter, however, the FCC is not asserting additional substantive authority, as it tried to do in *Iowa Utilities*. It is not asserting additional jurisdictional authority, but, rather, is issuing a regulation "necessary to fulfill its primary directives."

The agency's primary directive is to "enhance access to advanced telecommunications and information services" for schools and libraries. *See* § 254(h)(2)(A). It is taking modest steps to ensure that Congress's instructions on expanding universal service in the form of internet access and internal connections will not be

---

[97] *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995).

frustrated by local monopolies.[98]  For these reasons, we affirm the decision to permit support of non-telecommunications carriers providing internet access and internal connections to schools and libraries.

### 3.  ENCROACHING ON STATE AUTHORITY TO SET DISCOUNT RATES FOR INTRASTATE SERVICES TO SCHOOLS AND LIBRARIES.

Section 254(h)(1)(B) divides the regulation of discount rates on services offered to schools and libraries between the FCC and the states.  "The discount shall be an amount that the Commission, with respect to interstate services, and the States, with respect to intrastate services, determine is appropriate and necessary to ensure affordable access to and use of such services by such entities."  § 254(h)(1)(B).

The FCC has decided to offer federal universal service funds to help support the intrastate rate discounts.  Predictably, the agency has conditioned such funding on the states' "establish[ing] intrastate discounts at least equal to the discounts on interstate services."  Order ¶ 550.  GTE challenges this condition as an encroachment on the states' statutory right to "determine [what is] appropriate and necessary to ensure affordable access."

GTE has failed to point to any statutory or other authority

---

[98] The District of Columbia Circuit has upheld FCC actions under § 154(i) that require payments from parties even without express statutory authorization. *See Mobile Communications Corp. of Am. v. FCC*, 77 F.3d 1399 (D.C. Cir. 1996); *New England Tel. & Tel. Co. v. FCC,* 826 F.2d 1101 (D.C. Cir. 1987).

prohibiting the FCC's condition for funding.  States are free to refuse federal support for intrastate discounts and, therefore, remain free to determine what is "appropriate and necessary," consistent with the plain language of the statute.  In the Tenth Amendment context, this court has refused to view similar federal conditional grants as "equivalent to coercion."  *See Texas v. United States*, 106 F.3d 661, 666 (5th Cir. 1997).  Without express statutory language prohibiting such a practice, we reject GTE's challenge to the FCC's funding conditions.

4.   EXERCISING AUTHORITY IN DECIDING THAT SCHOOLS AND LIBRARIES CAN OBTAIN DISCOUNTS ON ALL COMMERCIALLY AVAILABLE TELECOMMUNICATIONS SERVICES.

The FCC has also decided that, pursuant to its authority under § 254(c)(3), it will allow schools and libraries to obtain supported discounts on all commercially available telecommunications services.  The agency believes that this approach will maximize schools' and libraries' flexibility to purchase whatever package of services they need.

GTE challenges the agency's statutory authority to refuse to limit the types of services that will be available for support.  It contends that the plain language of § 254(c)(3) requires the FCC to "designate" which telecommunications services will receive universal service support and which telecommunications services will not. The key to GTE's argument is the meaning of "designate."

According to GTE, "designate" denotes some action of specific

95

selection.  The standard dictionary definition of "designate" in-cludes "to distinguish as to class" and "to indicate and set apart for a specific purpose, office, or duty."  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 313 (10th ed. 1994).  GTE claims that by using the word "designate," Congress instructed the FCC to "indicate and set apart" which services may receive support under § 254(h).  GTE also finds support in the legislative history, which says the FCC should "take into account the *particular* needs of . . . schools and li-braries."[99]

We disagree with GTE that the plain-meaning understanding of "designate" demonstrates Congress's unambiguous intent to require the FCC to specify which services will be supported.  By using the word "designate," Congress also could have meant for the agency to authorize a broad class of services.  Thus, by "designating" all commercially available telecommunications service, the FCC can be said to have "designated" which services may be supported.  For this reason, the designation "commercially available telecommunications services" does not violate the plain meaning of the statute under *Chevron* step-one.

Under *Chevron* step-two, the FCC has reasonably concluded that it can fulfill its statutory duty to "designate" while giving schools and libraries the maximum flexibility to choose which

---

[99] *See* H. R. CONF. REP. 104-458, at 133 (emphasis added), *reprinted at* 1996 U.S.C.C.A.N. 144.

services they need.  It is not unreasonable for the FCC to conclude that it could best "take into account . . .the particular needs" of schools and libraries by allowing support for all commercially available telecommunications services.[100]  Because Congress's use of "designate" in subsection (c)(3) does not unambiguously require the FCC to limit which services may be supported, and because the FCC's decision is reasonable under *Chevron* step-two, we reject GTE's request and affirm the decision to allow schools and libraries to obtain support for all "commercially available telecommunications services."

5.   AUTHORITY TO SUBSIDIZE TOLL-FREE TELEPHONE CALLS
TO INTERNET SERVICE PROVIDERS BY NON-RURAL HEALTH CARE PROVIDERS.

Congress directed the FCC to provide universal service support for "any public or nonprofit health provider that serves persons who reside in rural areas."  § 254(h)(1)(A).  Congress also instructed the agency "to enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit . . . health care providers."  The FCC has seized on the more general language in the second provision as authority for subsidizing telephone calls to internet service providers by both rural and non-rural health care providers.

---

[100] The FCC further concluded that its decision will ensure that schools and libraries can obtain discounted "state-of-the-art telecommunications technologies as those technologies become available." *Order* ¶ 433.

97

GTE advances an argument based on the *expressio unius* canon. Because the first provision gives specific instructions on providing subsidized support for health care providers and explicitly limits that support to rural health care providers, GTE argues that the FCC has no statutory authority to expand such support to non-rural health care providers. In the agency's view, Congress could have extended support to non-rural providers, but chose not to. This signifies a Congressional decision that the FCC should respect.

The FCC responds that the *expressio unius* canon should not resolve a question of statutory interpretation in an administrative law context. Additionally, it argues that § 254(h)(2)(A) *obligates* the FCC to "enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services."

We do not read § 254(h)(2)(A)'s "enhancing" language to *require* the FCC to act as it did here. But, we conclude that the language in § 254(h)(2)(A) demonstrates Congress's intent to authorize expanding support to "advanced services," when possible, for non-rural health providers.

GTE has already established that § 254(h)(1)(A) requires support for telecommunications service to rural health care providers only. We can then read § 254(h)(2)(A) as an instruction to the FCC to work to support "advanced services" for non-rural health care

98

providers when "economically reasonable."  Importantly, the FCC's plan does not extend, to non-rural health providers, the same tele- communications discounts enjoyed by § 254(h)(1)(A) rural health providers.  Rather, the agency chose to support *access* (through subsidized telephone calls) to an "advanced . . . information service" (an internet service provider), finding that this subsidy was "economically reasonable" and "technically feasible." Order ¶ 748.

The FCC has found a way to "enhance access," as authorized by the plain language of § 254(h)(2)(A), so we affirm this portion of the Order.

6.  CONTRIBUTION SYSTEM TO PROVIDE UNIVERSAL SERVICE FUNDING
    FOR SCHOOLS, LIBRARIES, AND RURAL HEALTH PROVIDERS.

The FCC decided to fund the universal support mechanisms for schools, libraries, and rural health care providers by "assessing both the interstate and intrastate revenues of providers of interstate telecommunications services." Order ¶ 808.  The uncer- tainty of state support for the new § 254(h) subsidies and other financial considerations, according to the FCC, justifies assessing both the intrastate and interstate revenues of interstate carriers.

Cincinnati Bell ("CBT"), a small carrier with a mostly intrastate revenue base, attacks the decision as a violation of § 2(b)'s prohibition on federal regulation of intrastate services. The states challenge the FCC's related assertion that it has the

authority to require carriers to recover their intrastate contributions from the states.

### a. AUTHORITY TO ASSESS CONTRIBUTIONS ON THE COMBINED INTERSTATE AND INTRASTATE REVENUES OF CARRIERS THAT PROVIDE INTERSTATE TELECOMMUNICATIONS SERVICES.

Along the same lines as Bell Atlantic's challenge to the "no disconnect" rule, CBT argues that the FCC's decision to assess intrastate revenues exceeds its jurisdiction, in violation of the still-intact *Louisiana PSC* reading of § 2(b). CBT contends that unlike the provisions considered in *Iowa Utilities*, § 254 does not "apply" to intrastate matters in a sufficiently unambiguously manner so as to confer federal jurisdiction.

As we have discussed, we understand § 2(b) to serve as both a rule of statutory construction in considering whether a provision applies to intrastate matters and as a jurisdictional fence against assertions of the FCC's ancillary jurisdiction. *See Iowa Utilities*, 119 S. Ct. at 731. Like Bell Atlantic, CBT is using § 2(b) to challenge the FCC's construction of § 254 to *apply* to intrastate ratemaking.

The FCC's first defense denies that its actions even constitute a "regulation" that would fall under the rule of statutory construction created by § 2(b) and *Louisiana PSC*. The agency argues that simply factoring intrastate revenues into calculations of universal service contributions does not constitute

100

regulation of those services. The FCC has used both intrastate and interstate revenues as a basis for imposing accounting obligations or tariff requirements in other contexts without any court's finding § 2(b) violations. Additionally, the FCC has stated that carriers may recover their contributions only from *interstate* rates. The agency believes this last requirement will prevent its contribution requirements from improperly affecting intrastate rates.

Despite the persuasiveness of this argument, we conclude that § 2(b)'s broad language encompasses the FCC's decision to assess intrastate revenues. The plain language of § 2(b) discusses "jurisdiction with respect to . . . charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service . . . ." We agree with CBT that the inclusion of intrastate revenues in the calculation of universal service contributions easily constitutes a "charge . . . in connection with intrastate communication service."

The plain language of § 2(b) directs courts to consider FCC jurisdiction over a very broad swathe of intrastate services. We decline to exempt the FCC's assessment of intrastate revenues from the ambit of § 2(b).[101]

---

[101] The FCC's decision to prohibit carriers from recovering through intrastate rates does not save it from § 2(b) analysis. There is no question that the amount of a carrier's universal service contributions will increase with the inclusion of

(continued...)

The FCC then contends that § 254 does apply to intrastate matters, because it unambiguously authorizes the agency to develop universal service mechanisms that are sufficient to support both interstate and intrastate service. In support of this assertion, the agency points to § 254(d)'s requirement that "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute . . . to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service." The FCC then compares this language to § 254(f), which allows states to adopt universal service regulations as long as they do not "rely on or burden Federal universal service support mechanisms." This language, the FCC claims, shows that Congress intended for it to bear the primary responsibility for ensuring the sufficiency of universal service for both interstate and intrastate services.

These two provisions do not reflect enough of an unambiguous grant of authority to overcome the presumption established by § 2(b). While, under *Chevron* step-two, we usually give the agency deference in its interpretation of ambiguous statutory language,

_____

(...continued)
intrastate revenues. This cost, even if recovered only through interstate revenues, still constitutes a "charge in connection with intrastate service" under § 2(b).

    If the point of § 2(b) was to protect state authority over intrastate service, allowing the FCC to assess contributions based on intrastate revenues could certainly affect carriers' business decisions on how much intrastate service to provide or what kind it can afford to provide. This federal influence over intrastate services is precisely the type of intervention that § 2(b) is designed to prevent.

the Supreme Court continues to require the agency to overcome the § 2(b) statutory presumption with unambiguous language showing that the statute applies to intrastate matters.  *See Iowa Utilities*, 119 S. Ct. at 731.

While the text of the statute does not impose any limitation on how universal service will be funded, it also does not explicitly state that the FCC has the responsibility to fund intrastate universal services.  The agency seeks authority "in the broad language" of the statute, but "we do not find the meaning of the section so unambiguous or straightforward as to override the command of § 152(b)."  *See Iowa Utilities*, 119 S. Ct. at 731 (quoting *Louisiana PSC*, 476 U.S. at 377).

Without a finding that § 254 applies, the FCC has no other basis to assert jurisdiction, because *Iowa Utilities* explicitly prohibits FCC jurisdiction over intrastate matters stemming from the agency's plenary powers.  *See id.*  Therefore, we reverse that portion of the Order that includes intrastate revenues in the calculation of universal service contributions.

b.  AUTHORITY TO REFER CARRIERS TO THE STATES
TO SEEK RECOVERY OF INTRASTATE CONTRIBUTIONS.

Though it stated that it had "the authority to refer carriers to the states to seek authority to recover a portion of their intrastate contribution from intrastate rates," Order ¶ 818, the FCC also declined to exercise this authority.  Instead, it directed

103

carriers to recover their contributions from interstate revenues
only.

The states and CBT challenge this assertion of authority on
the same grounds they question the inclusion of intrastate revenues
for universal service contributions. Because the FCC bases its
authority on the same provisions it cited on that issue, our
decision to deny the agency jurisdiction on that question applies
equally to the its claim of authority to assess intrastate rates.

The FCC also raises a prudential defense, arguing that because
it has not chosen to exercise its authority, the issue is not yet
ripe for judicial review. Additionally, the agency argues that
both petitioners lack standing. We do not accept either of these
prudential defenses.

i. RIPENESS.

Conceding that the FCC has not yet acted on its decision to
assert authority over intrastate services, the states reject the
agency's ripeness claim because the "question presented is purely
legal." *See New Orleans Pub. Serv., Inc. v. Council of the City of
New Orleans*, 833 F.2d 583, 587 (5th Cir. 1987).[102] Pointing also to

---

[102] In its most recent action, the FCC reaffirmed its jurisdictional
authority to require carriers to contribute based on both intrastate and inter-
state revenues. *See Seventh Report and Order* ¶¶ 87-90. In fact, the FCC appears
to be awaiting a decision by this court before taking further action: "Ac-
cordingly, pending further resolution of this matter by the Fifth Circuit, the
assessment base and recovery base for contributions to the high-cost and low-
income universal service support mechanism that we adopted in the *First Report
(continued...)*

*Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190 (1983), the states argue that when the FCC has asserted its authority in a final decision on a legal question such as its jurisdiction over intrastate rates, "one does not have to await the ultimate impact of the threatened injury to obtain preventive relief." *See id.* at 201.

This issue is ripe for judicial review. The two factors for considering ripenessSSfitness for judicial decision and hardship to the partiesSSsupport our consideration of this question. Courts should be able to resolve a question such as jurisdiction and authority under the Act. Additionally, the states already have shown one example of the harm in withholding review. For instance, MCI, in the face of state opposition, has already begun billing some customers based on revenue from intrastate calls.[103]

ii.   STANDING.

---

(...continued)
*and Order* shall remain in effect." *Seventh Report and Order* ¶ 90. This invitation to judicial action further undercuts the FCC's ripeness defense.

[103] MCI has filed a supplemental brief rejecting this characterization. It relies on *MCI Telecomm. Corp. v. Virginia State Corp. Comm'n*, 11 F. Supp. 2d 669 (E.D. Va. 1998), *vacated as moot*, 1999 U.S. App. LEXIS 8749 (4th Cir. May 10, 1999) (unpublished), in which the court granted MCI's motion for injunctive relief from a Virginia state commission's order and ruling that MCI's disputed charges were not charges for intrastate calls. MCI also points to the FCC's recent order rejecting Virginia's administrative petition of the same issue. *See Virginia State Corp. Comm'n v. MCI Telecomm. Corp.*, No. E-99-01.FCC 99-42 (released Mar. 22, 1999). This ruling actually supports the states' ripeness argument, however, because the district court's final order on this question, along with the FCC's recent order, further demonstrates the propriety of judicial review of this question.

The FCC's standing defense has even less merit. First, states have a sovereign interest in "the power to create and enforce a legal code." *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982). Moreover, the FCC's refusal to exercise its declared authority does not deprive states of standing. The states point out that the District of Columbia Circuit will not find a lack of standing simply because an agency has refused to enforce its own regulations. *See Alaska v. United States Dep't of Transp.*, 868 F.2d 441, 444 (D.C. Cir. 1989). For the same reasons, we also reject the FCC's standing defense.

### iii. MERITS.

Having disposed of the FCC's prudential defenses, we reverse its claim that it can refer these carriers to the states for recovery of those contributions. This is for the same reasons that we reject the agency's assertions of jurisdiction to assess intrastate revenues for contributions. The FCC has failed to point to any statutory authority that explicitly demonstrates how § 254 applies to intrastate universal service. Therefore, we deny the agency's claim of jurisdiction and reverse this portion of the Order.[104]

---

[104] Having concluded that the FCC has no jurisdiction over intrastate rates for universal service purposes, we do not reach CBT's final argument challenging the agency's requirement that carriers recover their contributions solely from interstate revenues.

IV. CONCLUSION.

It is difficult to disagree with the Supreme Court's assessment that the Act is "a model of ambiguity or indeed even self-contradiction." *Iowa Utilities*, 119 S. Ct. at 738. As the Court notes, Congress realizes that many of these ambiguities will be resolved by the FCC during its implementation of the statute, and we, like the Court, generally defer to the agency's interpretation of the sometimes-mysterious sections. *See Chevron*, 467 U.S. at 842-43. In this case, we have done so, and we affirm most aspects of the Order implementing the universal service program and dismiss challenges to several parts of the Order as moot.

Still, our deferential approach does not require us to affirm the FCC in every circumstance. In particular, the agency exceeded its statutory authority in (1) prohibiting the states from imposing eligibility requirements and (2) requiring ILEC's to recover their contributions from access charges. Applying the Court's most recent pronouncements on the Act, we also deny the FCC jurisdiction over state control of local service disconnections and universal service contributions based on intrastate revenues. We remand one petition to the agency for reconsideration, so it can reconsider the propriety of assessing the international revenues of interstate carriers.

For the reasons stated, the petitions for review are GRANTED

IN PART and DENIED IN PART.  The May 8, 1997, Universal Service

Order is AFFIRMED in part, REMANDED in part, and REVERSED in part,

in accordance with this opinion.